**WEST TENNESSEE CHAPTER OF ASSOCIATED BUILDERS AND CONTRACTORS, INC., and Zellner Construction Company, Inc., Plaintiffs,**

v.

**CITY OF MEMPHIS, Defendant.**

No. 99–2001.

United States District Court, W.D. Tennessee, Western Division.

Dec. 20, 2000.

Stephen L. Shields, Jackson Shields Yeiser & Cantrell, Cordova, Ralph D. Golden, Golden Law Firm, Linda Jew Mathis, Golden & Mathis, Memphis, TN, Robert J. Proctor, Bradley A. Hutchins, Proctor Felton & Chambers, Atlanta, GA, for West Tennessee Chapter of Associated Builders and Contractors, Inc., Zellner Construction Company, Inc., plaintiffs.

Robert L.J. Spence, Jr., Felicia Izzard Corbin, Monika Lorice Johnson, Charmiane G. Claxton, City Attorneys Office, Memphis, TN, for City of Memphis, defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL AND STAY OF PROCEEDINGS

DONALD, District Judge.

In this action, Plaintiffs assert that Defendant City of Memphis's affirmative action plan violates the Fourteenth Amendment's Equal Protection Clause. Pursuant to 28 U.S.C. § 1292(b), Defendant moves for reconsideration of the Court's refusal to certify for appeal its interlocutory order concerning the admissibility of post-enactment studies. In its order the Court found post-enactment evidence inadmissible to show that Defendant had a compelling interest to enact legislation based on racial classifications. In the event the Court certifies its interlocutory order for appeal, Defendant requests a stay of all proceedings. The Court has jurisdiction under 28 U.S.C. § 1331. For the reasons stated herein, the Court **GRANTS** Defendant's motions.

### I. Procedural and Factual Background

The City of Memphis ("City") and other public entities commissioned a study, examining whether racial disparities existed in the procurement of contracts. Based on these statistics, the City passed a Minority and Women Business Enterprise program ("MWBE program") to address the City's alleged passive and active discrimination in its procurement of construction contracts. Caucasian contractors challenged the MWBE program's constitutionality, arguing that under the Equal Protection Clause, the City must have a compelling interest to legislate on the basis of racial classifications. According to Plaintiffs, the City's disparity study did not meet the evidentiary standards required to show a compelling interest. In response, the City proposed to supplement the legislative record with studies commissioned *after* enact-

ing the MWBE program. The City's post-enactment evidence would cover a five-year period between 1993 and 1998 and supplement the City's original disparity study.

On June 9, 1999, the Court ruled that post-enactment evidence may not be used to demonstrate the City's compelling interest. Defendant timely filed for certification of an interlocutory appeal. On July 14, 1999 the Court denied Defendant's motion for certification.

## II. Analysis

### A. Defendant's motion for interlocutory appeal

The appellate jurisdiction of circuit courts is generally limited to reviewing a district court's final judgment. 28 U.S.C. § 1291; *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). Congress recognized, however, that the orderly administration of justice is frustrated when parties are forced to grind forward to final judgment before they can challenge the correctness of some isolated, but determinative, question of law. *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.,* 29 F.Supp.2d 825, 831 (N.D.Ohio 1998); 16 Charles Alan Wright, et al., *Federal Practice and Procedure,* § 3929, at 368 (2d ed.1996) (citing *Hadji-pateras v. Pacifica, S.A.,* 290 F.2d 697, 702–03 (5th Cir.1961)). To address these exceptional circumstances, Congress created the interlocutory appeal to permit immediate appellate review of an order that does not dispose of the case on its merits.[1] 28 U.S.C. § 1292(b).

Under 28 U.S.C. § 1292(b), interlocutory appeal is appropriate when the district court's order involves a controlling question of law as to which there is a substantial ground for difference of opinion, and that an immediate appeal from the order would materially advance the litigation's ultimate termination. *Vitols v.. Citizens Banking Co.,* 984 F.2d 168, 170 (6th Cir. 1993) (per curium). Exceptional circumstances must exist or irreparable harm must seem imminent before leave is granted for an interlocutory appeal. *Coopers & Lybrand,* 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978); *United States v. Bilsky,* 664 F.2d 613, 619 (6th Cir.1981); *Orson, Inc. v. Miramax Film Corp.,* 867 F.Supp. 319, 321 (E.D.Pa.1994). Accordingly, § 1292(b) should be sparingly applied and used only to avoid protracted and expensive litigation. *Cardwell v. Chesapeake & Ohio Ry. Co.,* 504 F.2d 444, 446 (6th Cir.1974).

### 1. *Controlling law*

■ A matter of law is "controlling" if its resolution could materially affect the litigation's outcome. *Rafoth v. Nat'l Union Fire Ins. Co.,* 954 F.2d 1169, 1172 n. 8 (6th Cir.1992); *Sokaogon Gaming Enter. Corp. v. Tushie–Montgomery Assocs., Inc.,* 86 F.3d 656, 658 (7th Cir.1996); *North Fork Bank v. Abelson,* 207 B.R. 382, 389 (E.D.N.Y.1997). An issue is therefore controlling if its resolution on appeal could result in a reversal of a district court's final judgment. *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 755 (3rd Cir.1974), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). In addition, an issue may be considered controlling if its resolution has precedential value, *Rafoth,* 954 F.2d at 1172 n. 8 (6th Cir.1992); if it is

---

1. The Court's order holding post-enactment evidence inadmissible to show a compelling interest is not a final order. The merits of Plaintiffs' claim depend not on the admissibility of the post-enactment evidence, but rather on whether the City had a compelling interest to legislate on the basis of racial classifications. Accordingly, the Court's order is interlocutory, not final, and any attempt to appeal under 28 U.S.C. § 1291 would be premature.

central to liability, *Takacs v. Hahn Auto, Corp.*, No. C–3–95–404, 1999 WL 33117266, at *1 (S.D.Ohio April 23, 1999); or if it would save the Court and the litigants substantial time and resources. *Katz*, 496 F.2d at 755; 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3929, at 426 (2d ed.1996).

■ Admissibility of post-enactment evidence is a controlling issue of law. If the Court were to decide the case in Plaintiff's favor on pre-enactment evidence, it's decision would be subject to reversal if the Sixth Circuit found exclusion of post-enactment evidence improper. If the post-enactment evidence is deemed relevant, the Court's final judgment would be vacated and the case remanded.

Moreover, the Sixth Circuit's resolution of this issue would have significant precedential value. First, the issue is important as a matter of law because its resolution would clarify the evidentiary burden necessary to satisfy equal protection principles. *See e.g., Shaw v. Hunt*, 517 U.S. 899, 909–10, 116 S.Ct. 1894, 1902–03, 135 L.Ed.2d 207 (1996); *City of Richmond v. Croson*, 488 U.S. 469, 505, 109 S.Ct. 706, 728, 102 L.Ed.2d 854 (1989). Second, the issue affects many litigants, as governmental entities across the nation have sought to use post-enactment evidence to supplement their legislative records.[2] Resolving this issue would therefore provide guidance to cities and states attempting the delicate task of ending discriminatory practices through the use of racial classifications.

Finally, resolution of this issue is central to determining a city's or state's exposure to liability regarding its affirmative action program. The admissibility of post-enactment evidence has serious repercussions for cities and states throughout the nation that have continually culled new information, are in the process of reevaluating their plans, or, like Defendant, are faced with litigation and realize that the legislative record must be supplemented. Whether or not such post-enactment evidence is admissible can be the lynchpin of a governmental entity's exposure to liability.

In sum, the Court finds the admissibility of post-enactment evidence to be a controlling issue of law because its resolution by the Sixth Circuit (1) could result in the reversal of the Court's final judgment; (2) would possess precedential value; and (3) impacts a government entity's exposure to liability.

2. *Substantial grounds for difference of opinion*

■ Substantial grounds for a difference of opinion exist when (1) the issue is difficult and of first impression, *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2nd Cir.1990); (2) a difference of opinion exists within the controlling circuit, *German v. Federal Home Loan Mortg. Corp.*, 896 F.Supp. 1385, 1399 (S.D.N.Y. 1995), *Brown v. Mesirow Stein Real Estate, Inc.*, 7 F.Supp.2d 1004, 1008 (N.D.Ill. 1998); or (3) the circuits are split on the issue. *Rafoth*, 954 F.2d at 1172.

---

2. *See, e.g., Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2nd Cir.1992); *Contractors Assoc. of E. Pa., Inc. v. City of Phila.*, 6 F.3d 990, 1003–04 (3rd Cir. 1993); *Coral Constr. Co. v. King County*, 941 F.2d 910, 921 (9th Cir.1991) *cert. denied* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992); *Concrete Works of Colo., Inc. v. Den-* *ver*, 36 F.3d 1513, 1521 (10th Cir.1994); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1161, 1166–67 (10th Cir.2000); *Eng'g Contr. Assoc. of S. Fla., Inc. v. Metro. Dade County*, 122 F.3d 895, 911 (11th Cir.1997), *cert. denied*, 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998).

### a. Sixth Circuit decisions

There is no Sixth Circuit decision disposing of the present issue. *See, e.g., Assoc'd Gen. Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730 (6th Cir.2000). Though the Sixth Circuit in *Drabik* upheld the lower court's preclusion of post-enactment evidence, the district court barred supplementation on relevance grounds, but not as a matter of law. *Id.* at 738.

### b. Supreme Court's decisions

Like the Sixth Circuit, the Supreme Court has not squarely decided whether and when supplementation of a governmental entity's legislative record is appropriate to defend challenges to an affirmative action plan. In addition, as evidenced by other circuit courts' decisions, the Supreme Court's opinions leave room for a substantial disagreement over their reasoning and results. *Slater,* 228 F.3d at 1161, 1166–67 (stating that the Supreme Court's declarations in the affirmative action area are driven by plurality and split opinions and by the overruling of precedent).

Laws classifying citizens on the basis of race are constitutionally suspect and must pass the strict scrutiny test. Strict scrutiny applies whether or not the racial classification is remedial and allegedly founded on a benign legislative purpose. *Shaw,* 517 U.S. at 904, 116 S.Ct. at 1900; *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 228–29, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). Governmental entities may draw racial distinctions only when pursuing a "compelling state interest." *Shaw,* 517 U.S. at 908, 116 S.Ct. at 1902. The methods of achieving these goals must be narrowly tailored to accomplish that purpose. *Id.* While the strict scrutiny test, as applied to affirmative action programs, is not "strict in theory, fatal in fact," certain evidentiary standards must be satisfied. *Adarand Constructors, Inc. v. Pena,* 515 U.S. at 237, 115 S.Ct. at 2117; *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 2795, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring in judgment); *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 361–62, 98 S.Ct. 2733, 2784, 57 L.Ed.2d 750 (1978) (Brennan, J., concurring); *Shaw,* 517 U.S. at 909–910, 116 S.Ct at 1902–03.

Post-enactment evidence is admissible to determine whether legislation is narrowly tailored. *Drabik,* 214 F.3d at 736 (expecting a city to update statistics to ensure that remedial plan is narrowly framed to meet its objectives). The controversy surrounds a governmental entity's use of post-enactment evidence to show it had a compelling interest in passing its affirmative action program. *Compare Assoc'd Gen. Contractors of Am. v. Columbus,* 936 F.Supp. 1363, 1383 (S.D.Ohio 1995) (vacated on other grounds) *with Contractors Ass'n of E. Pa.,* 6 F.3d at 1003–04 (holding such evidence admissible).

■ Remedying the effects of past or present racial discrimination may constitute a compelling state interest in enacting remedial legislation based on race. *Shaw,* 517 U.S. at 909, 116 S.Ct. at 1902, *Croson,* 488 U.S. at 498–506, 109 S.Ct. at 724–28. Such legislation will survive strict scrutiny analysis only if the governmental entity can meet two conditions. Under the first condition, the governmental entity must proffer evidence identifying either private or public discrimination with some specificity. *Shaw,* 517 U.S. at 909, 116 S.Ct. at 1902; *Croson,* 488 U.S. at 504, 109 S.Ct. at 727. A generalized assertion of past discrimination in a particular industry is inadequate. *Shaw,* 517 U.S. at 909, 116 S.Ct. at 1902; *Croson,* 488 U.S. at 498, 109 S.Ct. at 724. The first condition emphasizes the necessity of tracing discrimination to the actions of the governmental

entity. *Croson*, 488 U.S. at 492, 109 S.Ct. at 721 (Powell, J.; Rehnquist, C.J., White, J.); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986); *Drabik*, 214 F.3d at 737 (holding that a governmental entity must produce statistics that expose "pervasive, systematic, and obstinate discriminatory conduct") (citing *Adarand*, 515 U.S. at 237, 115 S.Ct. 2097, 132 L.Ed.2d 158).

The second condition requires the governmental entity to have a "strong basis" in evidence that remedial action was necessary "*before* it embarks" on an affirmative action program. *Shaw*, 517 U.S. at 908 n. 4, 910, 116 S.Ct. at 1903 (emphasis in original); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986) (plurality). This condition ensures that the legislative body is motivated by the constitutionally permissible purpose of remedying past or present racial discrimination when it enacted the law.[3] *Shaw*, 517 U.S. at 910, 116 S.Ct. at 1903.

### 1. Competing views of *Shaw*

■ In *Shaw*, the plaintiffs challenged North Carolina's redistricting plan. The Court rejected North Carolina's effort to base it's race-conscious plan on remedying past discrimination. Although North Carolina proffered evidence that might have supported the first condition, identifying with specificity instances of past discrimi-

nation, the state failed to satisfy the second condition, having a strong basis in evidence of past discrimination before implementing the plan. North Carolina's *sole* evidence of past discrimination was derived from two post-enactment studies prepared during litigation. *Shaw*, 517 U.S. at 910, 116 S.Ct. at 1903. It was apparent in the record that a few legislators invoked North Carolina's sorry past of racial discrimination, but there was no evidence of any study or report that formed the basis for legislative action. *Id.*

In its June 9, 1999 Order, the Court interpreted *Shaw* to completely bar the use of post-enactment evidence in determining whether the city had a compelling interest in using a racial classification.[4] The Court interpreted *Shaw* to imply that the first condition is met when a city or state develops a statistical foundation for its plan consistent with *Croson* before it implements race-conscious relief. To satisfy the second condition, *Shaw* unambiguously requires that strong evidence justify a remedial purpose before enacting legislation based on racial classifications. *Shaw*, 517 U.S. at 910, 116 S.Ct. 1894 (emphasizing the word "before"). *Id.*

Despite the import of *Shaw*'s plain language, the Court does acknowledge that a colorable argument can be advanced that *Shaw* does not preclude post-enactment evidence if the governmental entity can

---

**3.** The question as to whether race-sensitive means are necessary to accomplish the legislature's objective is relegated to the "narrowly tailored" prong, not the "compelling interest" prong. *Drabik*, 214 F.3d 730, 738 (citing *Croson*, 488 U.S. at 507, 109 S.Ct. 706, 102 L.Ed.2d 854.)

**4.** See the Court's June 19, 1999 Order for its full analysis. The specific language of *Shaw*, in articulating the compelling interest test, is as follows. "First, the discrimination must be 'identified discrimination.' While the States and their subdivisions may take remedial ac-

tion when they possess evidence of past or present discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." 517 U.S. at 909, 116 S.Ct. at 1902 (citations omitted). "Second, the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude remedial action was necessary *before* it embarks on an affirmative-action program." *Id.*, 116 S.Ct. at 1903. (emphasis in original) (citations omitted).

proffer some degree of pre-enactment evidence. Although *Shaw* holds that post-enactment evidence alone is insufficient to justify remedial legislation, *id.,* it may fairly be interpreted to leave open the possibility that other evidence may supplement a plan's "proper factual basis." [5] *Id.* at 908 n. 4, 116 S.Ct. at 1902. *Shaw* may stand for the proposition that a "strong basis" in pre-enactment evidence does not constitute the "only basis"—requiring a minimum level of pre-enactment evidence does not foreclose supplementation of the legislative record with post-enactment evidence.

North Carolina's preparation for its redistricting plan in *Shaw* is distinguishable from the City's preparation for its MWBE program. North Carolina did not rely on any pre-enactment evidence of racial discrimination. *Id.* at 910, 116 S.Ct. at 1903. In contrast, the City's council possessed a report, commissioned and funded by nine closely knit governmental entities at the cost of roughly $900,000.00.[6] Unlike North Carolina's legislature, which may or may not have heeded the words of some of its members painting an ugly history of racial discrimination, the City's council relied on statistics that allegedly showed discrepancies in the area's hiring practices towards minorities. Where individual North Carolina legislators may have planted personal experience and hearsay in the legislative record, the City's council relied on findings that evinced discriminatory patterns within the City's procurement of services.

In highlighting these differences, it is not the Court's purpose to assess whether the City's report constitutes a strong basis

in evidence to demonstrate that the City's council was motivated by a constitutionally permissible purpose to remedy past discrimination. Such a determination would be premature, absent further briefing by the parties. The Court merely distinguishes the present case to emphasize one possible interpretation of *Shaw* and its potential impact on the parties.

Under this alternative interpretation of *Shaw,* post-enactment evidence is appropriate if it is used only to assess the first condition of the compelling interest test, whether the City's MWBE program meets evidentiary requirements suggested by *Croson. See, e.g., Concrete Works of Colo., Inc. v. Denver,* 36 F.3d 1513, 1521 (10th Cir.1994) (holding that the *Croson* requirements do not foreclose supplemental post-enactment evidence). On the other hand, its use in determining whether the legislative body meets the second condition, whether it had a strong basis in evidence of past discrimination before implementing the plan, is antithetical to equal protection doctrine. *Shaw,* 517 U.S. at 910, 116 S.Ct. at 1903. Post-enactment evidence cannot be used to assess whether or not the motivations in using a racial classification were driven by proper purposes—such facts were not in existence at the time of implementation. Further, hindsight is irrelevant to one's original motivation. This view is consistent with *Croson*'s characterizing racial classification as a "highly suspect tool," emphasizing the importance of "smoking out" illegitimate motives, such as racial prejudice. 488 U.S. at 493, 109 S.Ct. at 721. However, after an assurance that

---

**5.** The term "proper factual basis" refers to the evidence forming a strong basis for using a racial classification as a remedial tool. *Id.*

**6.** The City's Request For Proposals had required that the consultant determine whether there existed a "significant statistical disparity between the number of qualified [MWBE] contractors willing and able to provide goods and services and the number of such contractors actually engaged by Consortium Members or the Consortium Member's prime contractors."

the governmental entity passed legislation for remedial purposes, *Shaw* can be read to allow post-enactment evidence to supplement the statistical foundation showing the City's passive or active discriminatory practices.[7] *Id.* at 291, 106 S.Ct. at 1856 (O'Connor, J., concurring); *Shaw*, 517 U.S. at 908 n. 4, 910, 116 S.Ct. at 1903.

This view allows the flexibility necessary to address one of the more complex and pressing issues facing cities and states today. Requiring a city to have strong evidence that remedial action is necessary before using racial classifications balances the tensions inherent in using racial classifications to cure racial discrimination. Though the Fourteenth Amendment generally prohibits racial classifications, *Shaw*, 517 U.S. at 907, 116 S.Ct. at 1902, its core purpose is to do away with governmentally imposed discrimination based on race. *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984). Cities and states may therefore be faced with the delicate task of using racial classifications to remedy racial discrimination. For though racial classifications are a suspect remedy, *id.* at 273, 106 S.Ct. at 1846, they may nevertheless be necessary to correct the impact of past discrimination. *Shaw*, 517 U.S. at 909, 116 S.Ct. at 1903. Reconciling these seemingly conflicting principles requires extraordinary care. *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848 (plurality). Requiring a political entity to prove anything more than "strong evidence" of racial discrimination before enacting an affirmative action plan could undermine the incentive to voluntarily meet its civil rights obligations. *Id.* at 290, 106 S.Ct. at 1855 (O'Connor, J., concurring).

If there is a strong basis in the evidence to show the government's purpose was proper, there may be little justification in disallowing governmental entities from supplementing pre-enactment evidence with post-enactment studies reinforcing the statistical integrity of their initial findings.

2. *Competing views of Wygant and Croson*

Although the Court adopted one interpretation of *Shaw*, the Court acknowledges that decisions preceding *Shaw* could be interpreted to favor either position. In *Wygant*, a school board terminated nonminority teachers before terminating less senior minority colleagues. The Court held that the school board's termination policy violated the Fourteenth Amendment. 476 U.S. at 271, 273, 106 S.Ct. at 1845, 1846. Although the school board's plan was based on a finding of societal discrimination, the Court found this evidence insufficient. Notably, the Court rejected the school board's offer of post-enactment evidence to supplement the legislative record, but not on protection principles. Rather, the post-enactment evidence was not part of the record, and the Court held it violated the "unquestioned rule that [the] Court decides cases based on the record before it." *Id.* at 278 n. 5, 106 S.Ct. at 1849 (plurality). Moreover, the Court was not required to reach the admissibility issue, because it held that, even if the school board had a compelling purpose, its plan was not narrowly tailored. *Id.* at 283, 106 S.Ct. at 1852. The Court in *Wygant*, therefore, did not reject post-enactment evidence *because* it was post-enactment evidence.

---

7. More than evidence of societal discrimination must be shown. *Croson*, 488 U.S. at 500, 109 S.Ct at 725. For example, evidence that suggests discrimination is traceable to the public entity's actions would suffice. *Wygant*, 476 U.S. at 277, 288, 106 S.Ct. at 1849, 1854 (plurality).

In *Croson,* Caucasian contractors challenged Richmond, Virginia's affirmative action program. The Court held that the City proffered insufficient evidence supporting the first condition—that a city develop evidence meeting the Fourteenth Amendment's specificity requirements. In *Croson,* the *only* evidence that supported Richmond's decision to pass an affirmative action plan compared the city's minority population to the percentage of contracts awarded to minority firms.[8] 488 U.S. at 485, 109 S.Ct. at 717. According to the Court, such statistics did little to show that the council's actual purpose was to pass remedial legislation and not to create a racial preference. *Id.* The Court suggested that instead, Richmond might have conducted a disparity study comparing the percentage of contracts going to minorities to the percentage of minorities qualified to undertake the particular task. *Id.* at 501, 109 S.Ct. at 726.[9]

c. Other circuit court decisions

Though the five circuit courts deciding the issue are unanimous in permitting supplementation, they take different paths to reach the same destination. *Harrison & Burrowes Bridge Constructors, Inc. v.*

*Cuomo,* 981 F.2d 50, 60 (2nd Cir.1992)[10]; *Contractors Assoc. of E. Pa., Inc. v. City of Phila.,* 6 F.3d 990, 1003–04 (3rd Cir.1993); *Coral Constr. Co. v. King County,* 941 F.2d 910, 921 (9th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992); *Concrete Works of Colo., Inc. v. Denver,* 36 F.3d 1513, 1521 (10th Cir. 1994); *Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147, 1161, 1166–67 (10th Cir.2000); *Eng'g Contr. Assoc. of S. Fla., Inc. v. Metro. Dade County,* 122 F.3d 895, 911 (11th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998). To complicate matters, decisions by the Second, Third, and Ninth Circuits preceded *Shaw,* while decisions by the Tenth and Eleventh Circuits succeed *Shaw.*

The Ninth Circuit, held, consistent with *Shaw's* subsequent holding, that legislating on the basis of race without any pre-enactment evidence of discrimination is presumptively void. *Coral Const.,* 941 F.2d at 921. The Ninth Circuit went on to hold that, where a state has a good faith reason to believe that systemic discrimination has occurred, it would not strike down a program for inadequacy of the record if post-

---

**8.** The *Croson* decision implies that the city council did not attempt to supplement the legislative record with post-enactment evidence. *Id.* at 477–86, 109 S.Ct. at 713–18.

**9.** The Court in *Croson* also found that the evidence proffered by the Richmond City Council failed to constitute a "strong basis in evidence" for its conclusion that remedial legislation was necessary. Although *Croson* does not describe what constitutes such evidence, it did describe what evidence did not suffice. *Croson* held that evidence of societal discrimination is insufficient to establish "strong evidence." *Id.* at 500, 109 S.Ct. at 725.

**10.** *Harrison* is of dubious importance. Like *Drabik,* it does not directly reach the issue of whether post-enactment evidence is admissible. *Harrison* involved New York City's set-

aside regulations passed pursuant to state law. State law empowered cities to encourage and assist minority businesses to participate in work on governmental contracts. *Harrison,* 981 F.2d at 60. The constitutionality of the *state* legislation was not at issue. *Id.* Instead, plaintiffs challenged the constitutionality of the city's regulations. *Id.* The case was ultimately dismissed against the city. The court held that a prospective injunction was moot because the city had *dismantled its existing program* and was in the process of *drafting new regulations* in light of new studies. *Id.* The damage claims were dismissed on qualified immunity grounds because the city's previous plan was passed before *Croson,* and officials had reasonably thought that they were compliant with equal protection requirements when enacting the original regulations. *Id.* at 61.

enactment fact-finding supports the program. *Id.* Imposing the *Shaw* decision over *Coral Constr.*, once a city can show strong evidence justifying a proper purpose, then post-enactment evidence can supplement those findings.

The Third Circuit, faced with facts similar to the case *sub judice*, questioned whether evidence generated after enactment, but covering a pre-enactment period, is properly characterized as post-enactment evidence.[11] *Contractors Ass'n of E. Pa.*, 6 F.3d at 1003–04. Nevertheless, it reasoned that disallowing post-enactment evidence would put cities and states in a precarious position. Governmental entities must pro-actively remedy past discrimination and ensure their efforts in doing so do not violate the Equal Protection Clause. *Id.* at 1004. If post-enactment evidence was inadmissible, despite some evidence showing complicit participation in discriminatory practices, a city would be forced to wait for further study despite its continuing perpetration of discriminatory practices. *Id.*

The Ninth Circuit's decision reflected similar reasoning. Rejecting post-enactment evidence would in effect force governmental entities to wait for the completion of time consuming studies before acting, despite knowledge that current practices were discriminatory. This would unfairly expose cities and states to liability while they are forced to continue violating equal protection principles pending further studies. *Coral Constr.*, 941 F.2d at 921; *see also Wygant*, 476 U.S. at 291, 106 S.Ct. at 1856. The Ninth Circuit found it unacceptable to interpret the Constitution as mandating such a Hobson's choice—if a city acts it violates the Constitution, and if a city doesn't act it violates the Constitution.

The Third Circuit, as well as the Tenth and Eleventh Circuits, highlighted the appropriateness of supplementing the record when injunctive relief is requested. *Contractors Ass'n of E. Pa.*, 6 F.3d at 1004. As injunctions seek prospective relief only, it follows that all evidence preceding the issuance of an injunction must be considered, including post-enactment evidence. *Id.; Concrete Works*, 36 F.3d at 1521; *Eng'g Contractor's Ass'n of S. Fla.*, 122 F.3d at 911. In the instant case, Plaintiffs have requested injunctive relief.

In permitting the use of post-enactment evidence, the Tenth Circuit seized on *Croson's* language that a city must "identify [the] discrimination ... with *some* specificity before [it] may use race-conscious relief." *Concrete Works*, 36 F.3d at 1521 (quoting *Croson*, 488 U.S. at 504, 109 S.Ct. at 727) (emphasis added). The Court in *Concrete Works* reasoned that *Croson* therefore does not foreclose consideration of post-enactment evidence, because *Croson* only required identification of racial discrimination with "some" specificity.[12]

---

11. As mentioned, the City's "post-enactment" evidence covers the years between 1992 and 1996. The MBWE plan was not enacted until 1996.

12. The Court notes, though the Tenth Circuit may ultimately be correct in its conclusion, it quoted *Croson*'s language out of context. "Some specificity" refers not to the quantum of evidence required, but to the permissible geographic scope of the statistics; i.e., a city cannot rely on a study showing *national* or *state-wide* disparities in the percentage of public contracts awarded to minority business. *Croson*, 488 U.S. at 504, 109 S.Ct. at 727.

The Eleventh Circuit also interpreted the Supreme Court's language out of context when it seized on *Wygant*'s statement that a "contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan." *See e.g., Eng'g Contractors Ass'n of S. Fla.*, 122 F.3d at

d. *Summary of Sixth Circuit, Supreme Court, and other circuit court decisions*

*Shaw, Wygant,* and *Croson* are all susceptible to competing interpretations, and the Sixth Circuit has not rendered a decision on the matter. The five circuit court decisions permitting post-enactment supplementation of the legislative record reached identical results, but through different means. Accordingly, a substantial disagreement of opinion exists as to the proper role played by post-enactment evidence.

### 3. *Materially advance the litigation*

 Interlocutory appeal is favored where reversal would substantially alter the course of the district court proceedings or relieve the parties of significant burdens. *Iron Workers,* 29 F.Supp.2d at 833. Interlocutory appeal is most appropriate early in the proceedings. *Id.* at 835. In contrast, the role of interlocutory appeal is diminished when a case is nearing trial and large expenditures have already been made. *Id.; see also Takacs v. Hahn Auto. Corp.,* No. C–3–95–404, 1999 WL 33117266, at *4 (S.D.Ohio April 23, 1999).

Parties have engaged in minimal discovery to this point. An interlocutory decision will potentially save substantial judicial resources and litigant expense. Discovery in this case will be immense and is estimated to take eighteen months.[13] Absent an interlocutory appeal, depositions of relevant witnesses would focus on pre-enactment evidence. If the admissibility issue was found in error on final appeal, however, depositions would have to be re-taken to address post-enactment evidence, probably taking an additional eighteen months.

Though the potential savings will be substantial for discovery proceedings, an interlocutory decision could have a major impact on the time and expense involved at trial. The trial is expected to last ten days and involve extensive expert testimony. The first trial will inevitably test the sufficiency of the pre-enactment evidence. A second trial would duplicate expert testimony on pre-enactment evidence because a new jury would be empaneled. Immediate resolution of this issue has the potential to materially advance this litigation because it will potentially save judicial resources and litigant expense.

### 4. *Exceptional circumstances*

An interlocutory appeal should only be granted in exceptional circumstances, used sparingly to avoid protracted and expensive litigation. *Cardwell,* 504 F.2d 444, 446 (6th Cir.1974). In *Cardwell,* the Sixth Circuit held that it was inappropriate to certify for interlocutory appeal a simple personal injury or wrongful death case that could be disposed of on their merits in a few days. In stark contrast, the legal and statistical issues in the instant case are complex, and the financial and legal stakes are high. Resolving the post-enactment evidence issue early in the proceedings would potentially save time and avoid duplicative litigation over issues that should, because of the constitutional dimension, be promptly adjudicated.

911. Rather than stand for the proposition that post-enactment evidence is appropriate, the Court's statement was intended to relieve a city or state from showing that it actually discriminated; showing passive participation in discriminatory practices would be sufficient. *Wygant,* 476 U.S. at 292, 106 S.Ct. at 1856 (O'Connor, J., concurring).

13. At the parties scheduling conference in May, 2001, the discovery deadline was set for August, 2001.

### 5. *Conclusion*

█ Immediately resolving this issue may materially affect and advance the outcome of the proceedings. Interlocutory appeal is proper, because, evident through Supreme Court and circuit court decisions, substantial disagreement of opinion exists as to the admissibility of post-enactment evidence. That discovery is undeveloped does not hinder the Sixth Circuit's review, as a well-developed record is unnecessary to determine whether post-enactment evidence is admissible to show a compelling state interest. 16 Charles Alan Wright, et al., *Federal Practice and Procedure,* § 3929, at 380–83 (2d ed.1996). In fact, that discovery is undeveloped *supports* immediate review, as early intervention potentially will relieve the Court and the parties from future burdens created by duplicative and expensive proceedings. *Id.* at 416.

Additional considerations support certification of interlocutory appeal. This issue is inextricably linked to the substance of equal protection review. Because this issue involves an important question of law, interlocutory appeal is especially appropriate. *Atl. City Elec. Co. v. Gen. Elec. Co.,* 207 F.Supp. 613, 620, (D.C.N.Y.1962), *aff'd,* 312 F.2d 236 (2nd 1962), *cert. denied,* 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed.2d 411. 16 Wright, et al., § 3930 at 422.

While proximity in time to the final judgment on the merits weighs against interlocutory appeal, here litigation is in its early stages. Parties are not scheduled for trial until February, 2002, over a year from now. Moreover, parties have engaged in very little discovery. Because parties are in early stages of litigation, interlocutory appeal is advantageous. *Baranski v. Serhant,* 602 F.Supp. 33, 36 (D.C.Ill.1985). In accordance with 28 U.S.C. § 1292(b), the Court GRANTS Defendant's motion to certify for appeal its June 9, 1999 Order precluding the admission of post-enactment evidence to show a compelling state interest.

### B. Defendant's motion for a stay

█ In evaluating whether a stay should be granted pending the circuit court's disposition of an interlocutory appeal, the Court considers the same factors as it does for a preliminary injunction: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. *Mich. Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991).

Due to the procedural posture of this case, the first factor must be assessed in light of incomplete factual findings and is therefore afforded a fair degree of deference. *Id.; Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537 (6th Cir.1978). At minimum, Defendant must show serious questions going to the merits of the district court's decision. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). Defendant emphasizes five circuit courts decisions in its favor. Serious questions, therefore, exist as to the proper application of post-enactment evidence to show a compelling state interest. *See Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n,* 812 F.2d 288, 290 (6th Cir.1987) (implying that the necessary showing of likelihood of success on the merits is inversely proportional to the strength of other factors in the moving party's favor).

Defendant contends that it will be irreparably harmed absent a stay. In evaluating the harm to Defendant, the Court looks to the substantiality of the injury alleged, the likelihood of its occurrence, and the adequacy of the proof provided.

*Mich. Coalition,* 945 F.2d at 154. When Plaintiff moves for a preliminary injunction, the Court will be restricted to examining only pre-enactment evidence, making a preliminary injunction's issuance more likely than if the Court admitted post-enactment evidence. If, however, the Sixth Circuit subsequently reverses this Court's June 9, 1999 Order and holds that post-enactment evidence is permissible to supplement the legislative record, there may exist grounds to dissolve the preliminary injunction. In the meantime, the City would have had to implement race-neutral procedures, reassess all contracting bids before it, and then, if the injunction is dissolved, re-engage the MWBE program. This would cause a major disruption and possibly frustrate the City's constitutional obligation to ensure it does not discriminate against its citizens.[14] *Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984). As the harm is constitutional in nature, it is irreparable. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2948.1, at 161 (2d ed.1996); *see also Coalition for Econ. Equity v. Wilson,* No. C 96 4024 TEH, 1996 WL 691962, at * 3 (N.D.Cal. Nov.27, 1996). Additionally, the City would suffer irreparable non-compensatory harm because there is no way to calculate any damages to the City for forcing a gap in the enforcement of its MWBE program. Moreover, the program's re-engagement would not alter contracts secured when a preliminary injunction was in place.

On the other hand, if Plaintiffs are correct that the MWBE program violates their equal protection rights, a stay may prolong their exposure to unconstitutional conditions. Indeed, considerations of the City's financial health and administrative efficiency cannot run roughshod over plaintiff's constitutional rights. *See Reed v. Rhodes,* 549 F.2d 1050, 1052 (6th Cir. 1976). At the same time, a stay also implicates the constitutional interests of minorities in the construction business and their continuing employment opportunities. If the MWBE program is enjoined, minority business's would likely be severely and negatively impacted, resulting in irreparable harm. *See Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147, 1161, 1167 (10th Cir.2000) (stating that ample evidence shows that when race-conscious public contracting programs are struck down or discontinued, minority business participation in the relevant market drops sharply) (citing 144 Cong. Rec. S1421 (March 5, 1998) (statement of Sen. Moseley–Braun)). Moreover, a stay is shorter in duration than a preliminary injunction. The possible harm to Plaintiffs' constitutional interests in granting a stay are therefore less than the possible harm to the minority businesses' constitutional interests in denying a stay.

Public interest strongly favors a stay. Eleven of the twelve council members who were present voted to pass the MWBE program. *See* Defendant's Memorandum in Support of Motion for Certification of Interlocutory Appeal and Motion to Stay Proceedings, at *9. Additionally, it would be in the public interest to maintain coherence, stability, and integrity in the judicial proceedings surrounding the MWBE program's legality. Absent a stay, the Court

---

**14.** The Sixth Circuit has stated that harm to the moving party cannot be speculative. *Michigan Coalition,* 945 F.2d at 154. Instead, the harm must be certain and immediate. *Id.* The Court emphasizes that, though it is speculative as how the Sixth Circuit will decided the post-enactment evidence issue, it is certain that Plaintiffs will move for a preliminary injunction. *See* Complaint, ¶ 3 at *12. Defendant does not have to wait to be injured before moving for a stay. 11A Wright, et al., § 2948.1, at 155.

is faced with the prospect of temporarily dismantling the MWBE program which the City's elected officials voted to pass. The Court would further be faced with the prospect of dissolving the injunction and reinstating the MWBE program if the Sixth Circuit holds post-enactment evidence is admissible. The Court does not shy away from the repercussions of protecting constitutional rights. On the contrary, because the issues at stake are so important the Court should make a fully informed decision before disrupting the status quo. The Court finds that constitutional interests at stake are best protected if the Court waits for guidance from the Sixth Circuit on an issue that is undisputably central to the complete and fair disposition of the case.

Finally, the Court notes that not issuing a stay would frustrate the very objectives of the interlocutory appeal, which is to achieve judicial economy and discourage piecemeal litigation. Moreover, staying the proceedings facilitates a seamless and fair adjudication of the merits, and saves judicial resources and litigant expense. Fed.R.Civ.P. 1. Although the Court recognizes the possible harms to others in granting a stay, the factors ultimately weigh in Defendant's favor. Defendant's motion to stay all proceedings pending resolution of the interlocutory appeal is accordingly **GRANTED.**

## III. Order

For the foregoing reasons, the Court **GRANTS** Defendant's motion for an interlocutory appeal of the Court's June 9, 1999 Order refusing to admit post-enactment evidence for the purpose of showing a compelling state interest. The Court also **GRANTS** Defendant's motion for a stay of the proceedings pending the Sixth Circuit's disposition of the interlocutory appeal.