**GAYLORD ENTERTAINMENT COMPANY, Plaintiff,**

**GILMORE ENTERTAINMENT GROUP, LLC., Defendant.**

No. 3:99CV0629.

United States District Court, M.D. Tennessee, Nashville Division.

Sept. 28, 2001.

Memorandum Denying Reconsideration Oct. 8, 2002.

Lee Webb Campbell, II, Thomas Johnson Sherrard, Stephen P. Spann, Sherrard & Roe, Nashville, TN, Judith A. Powell, Jerre B. Swann, William H. Brewster, R. Charles Henn, Jr., Kilpatrick Stockton LLP, Atlanta, GA, for Gaylord Entertainment Company.

Waverly David Crenshaw, Jr., Waller, Lansden, Dortch & Davis, Nashville, TN, Christopher Craig Larkin, Kenneth Leonard Wilton, Jack Donald Samuels, Small Larkin, LLP, Los Angeles, CA, Thomas H. Dundon, James F. Neal, Mark P. Chalos,

Neal & Harwell, Nashville, TN, Norman H. Zivin, John R. Garber, Cooper & Dunham, LLP, New York City, for Calvin Gilmore Productions Inc, Gilmore Entertainment Group, LLC.

## MEMORANDUM

HAYNES, District Judge.

Plaintiff, Gaylord Entertainment Company ("Gaylord"), a Delaware corporation, with its principal place of business in Nashville, Tennessee, filed this action under the Federal Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1051 *et seq.*, as amended, against the defendants: Calvin Gilmore Productions, Inc., a Delaware corporation with its principal place of business in Myrtle Beach, South Carolina[1] and Gilmore Entertainment Group, LLC. ("GEG"), a South Carolina corporation with its principal place of business in Myrtle Beach, South Carolina. Gaylord also asserts supplemental state law claims under Tennessee trademark dilution statute law and similar laws of other states.

Gaylord is the owner of the Grand Ole Opry, that also is referred to as the "Opry" both in the trade and by the public. Gaylord owns a wide range of federal and state trademark registrations for marks incorporating the formative "Opry," most notably including the "Grand Ole Opry" and "Opryland."

GEG conducts a music and variety show in Myrtle Beach, South Carolina under the name and mark "The Carolina Opry." GEG advertises its show as "the Opry," and uses the toll-free number 1–800–THE–OPRY to solicit ticket sales. GEG also promotes its show using domain names incorporating the term "Opry."

Gaylord alleges, in essence, that GEG's adoption and promotion of "The Carolina Opry" name and mark for its musical revue, and its use of the term "Opry" in connection with advertising and the solicitation of ticket sales for "The Carolina Opry," violates Gaylord's trademarks. Gaylord also alleges that GEG's activities in advertising and promoting their musical show constitute unfair competition because they are likely to cause confusion in the market as to a possible relationship or affiliation between "The Carolina Opry" and the "Grand Ole Opry." In addition, Gaylord alleges that the use and promotion of the mark "Carolina Opry" will dilute the distinctiveness of Gaylord's family of Opry marks. Gaylord specifically asserts the federal claims for trademark infringement, unfair competition, and trademark dilution under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as amended. In addition, Gaylord also asserts claims for violations of various state laws on trademark dilution, trademark infringement, and common law trademark infringement.

Gaylord seeks a permanent injunction against GEG. Gaylord also seeks an accounting for all profits received from infringement, unfair competition, dilution or other improper activity, and damages for injury that it has sustained. Finally, Gaylord seeks an order for the impoundment of all infringing materials or goods using any unauthorized colorable imitation of the Opry marks. (Docket No. 3, first amended complaint).

Before the Court is the GEG's motion for summary judgment (Docket Entry No. 60) for which oral arguments were held (Docket No. 123).

The gravamen of GEG's motion is that the term "Opry" is generic. GEG asserts that if "Opry" is a generic term, then it is not entitled to any federal, state, or com-

---

1. The dispute between Plaintiff and this Defendant has been settled, and Defendant was dismissed. The Court issued a final judgment and permanent injunction. (Docket Entry No. 54).

mon law protection. GEG argues that Gaylord cannot claim exclusive right to the use of the term "Opry" and that GEG's use of such term in the promotion of "The Carolina Opry" cannot give rise to trademark infringement, trademark dilution, or unfair competition claims. Second, GEG also contends that in light of a prior adverse court decision, Gaylord is collaterally estopped from litigating the generic nature and meaning of the term "Opry." Thus, GEG argues that it is entitled to judgment as a matter of law on all of Gaylord's causes of action.

In response, Gaylord argues that material factual disputes exist on all claims such that summary judgment is inappropriate. Specifically, Gaylord argues that the term "Opry" is not generic, and that collateral estoppel does not preclude them from disputing the generic status of the term "Opry." In addition, Gaylord argues that even if the term "Opry" were found to be generic, Gaylord could still prevail on its unfair competition or trademark infringement claims. (Docket Entry No. 123, oral argument).

## A. Review of the Record [2]

Gaylord's predecessors [3] founded the Grand Ole Opry in 1927. Initially, the Grand Ole Opry, a musical revue featuring country music and dramatic, comedy, and variety performers, was performed live before a studio audience in Nashville, Tennessee. By 1943, NBC Radio was broadcasting the Grand Ole Opry to 125 stations nationwide. In 1955, the Grand Ole Opry made its television debut with NBC and ABC airing the shows nationwide. The Grand Ole Opry has continued to grow in popularity and notoriety over the past several decades. In 1983, the Grand Ole Opry began making weekly nationwide broadcasts on The Nashville Network (TNN), including a half-hour pre-show entitled Opry Backstage. Over its history, the Grand Ole Opry has showcased and periodically inducted as new members many of the greatest twentieth-century country music performers. These performers, as well as news sources, music aficionados and the public consistently refer to the Grand Ole Opry as the "Opry." (Docket Entry No. 1, ¶ 13–15, 20–21, at 5–7; *see also* Docket Entry No. 113, defendant's response to plaintiff's statements of material facts, ¶ 3–4, at 2).

Gaylord registered the "Grand Ole Opry" as a trademark on July 11, 1950.[4] Since that date, Gaylord has registered and currently owns at least 39 marks that contain the formative "Opry," most notably including the marks "Grand Ole Opry," "Opryland USA," "Opryland Hotel," "Opryland," "1–800–SEE–OPRY," "1–800–

**2.** Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. *Duchon v. Cajon Co.,* 791 F.2d 43, 46 (6th Cir.1986) *app.* 840 F.2d 16 (6th Cir.1988) (unpublished opinion). As will be discussed *infra,* under recent Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 276 (1986). The Court concludes that there are material factual disputes, thus, this section does not constitute a finding under Fed.R.Civ.P. 56(d).

**3.** Gaylord and their predecessors-in-interest are collectively referred to as "Gaylord."

**4.** The registration was for "radio program broadcasting service; for entertainment services though medium of radio and personal appearance performance ..." (Docket Entry No. 1, ¶ 26, at 9). In 1957, the "Grand Ole Opry" mark was registered for "title of entertainments services ..." *Id.* ¶ 27.

WSM-OPRY." (Docket Entry No. 1, ¶ 24-35, at 8–14). In addition to the federally registered trademarks, Gaylord also owns State of Tennessee registrations for several marks that incorporate the formative "Opry." *See id.* ¶ 14, at 6. Gaylord has continuously and extensively used the Opry marks since founding the Grand Ole Opry in 1927. Gaylord also registered the mark "Opry" on January 12, 1982.[5] It has spent substantial time and money advertising the Opry marks. According to Gaylord, "billions of dollars worth of goods and services have been sold by Gaylord and its predecessors under the Opry marks." (Docket Entry No. 1, ¶ 37, at 15).

In 1986, GEG's predecessors[6] started The Carolina Opry in Myrtle Beach, South Carolina. At that time, the founders of The Carolina Opry were aware of the existence of the Grand Ole Opry music show. (Docket Entry No. 58, Answer ¶ 40). GEG is the present operator of The Carolina Opry, which like the Grand Ole Opry, is a music and variety show. (Docket Entry No. 82, undisputed facts ¶ 1, at 1). It has been in continuous operation from 1986 to the present. (Docket Entry No. 58, Counterclaim ¶ 3).

Since its inception, GEG has advertised and promoted The Carolina Opry as "the Opry." It uses the toll-free number "1–800–THE–OPRY" to solicit ticket sales. GEG also maintains internet domain names that incorporate the formative "Opry," including THEOPRY.COM and OPRY.NET. (Docket Entry No. 113, response to plaintiffs' statement of material facts as to which there exists a genuine issue to be tried ¶ 10, at 5). In addition, the first advertising campaign for The Carolina Opry used the slogan "Like the Grand Old [sic] Opry with a Dash of Broadway."[7] *Id.* ¶ 17, at 7.

GEG owns a federal registration for the mark "The Carolina Opry" ( & design) and the mark "Calvin Gilmore Presents The Carolina Opry" ( & design). (Docket Entry No. 82, Plaintiff's Responses to Defendants's Statement of Undisputed Facts ¶ 4). GEG did not disclaim rights in the term "Opry" in connection with either of these marks. *See id.* Both marks are for "entertainment services in the nature of country and western music shows." (Docket Entry No 58, counterclaim ¶ 4).

### 1. Gaylord's Evidence

Gaylord has produced evidence to dispute the notion that the term "Opry" is, or has ever been, a generic term for its current meaning of a country barn dance. Gaylord has retained as an expert witness Celia Tichi, Ph.D., a Professor of English at Vanderbilt University who testified that the name "the Grand Ole Opry" was not generic, but rather a distinctive brand name coined by Gaylord's predecessors which combined the familiar terms "opry" and "grand opera" in new way to produce a "unique hybrid name." (Docket Entry No. 85, Exhibit 2, Tichi Declaration ¶ 21). Tichi compared this hybrid name with other trademark products that have combined

---

5. As will be discussed *infra*, the Eighth Circuit court in *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1329 (8th Cir.1984), affirmed the cancellation of Gaylord's federal registration for the "Opry" mark because it found that the term "Opry" was generic. *See.*

6. GEG and their predecessors-in-interest are collectively referred to as "GEG."

7. The parties have differing accounts regarding the length of time this advertising slogan was used to advertise "The Carolina Opry." GEG state that it was only used for a year or two, but definitely was not in use as of 1990. *See* (Docket Entry 113, Defendant's Response to Plaintiff's Statement of Material Facts, at 9). Gaylord believes the slogan was used until at least 1990, and contends that it appears in current promotional materials distributed to the press; GEG states that this is incorrect. *See id.*

two familiar words in new combinations, including Lucky Strike cigarettes and Eskimo Pie ice cream bars. *Id.* She stated that the term "opry," was a dialectic variation of "opera" and had been used in the United States since the seventeenth century to refer to "a public performance venue featuring varying musical and theatrical performance, none of which resembled classical opera." *Id.* at ¶ 17. Tichi testified that "opry" did not itself, however, "refer to the rural country music show, whose generic term instead had been 'barn dance'." *Id.* at ¶ 18. The term "grand opera" entered into usage in an 1879 dictionary and referred to "drama interpreted by full orchestral music, the text being sung throughout." *Id.* at ¶ 19. In coining the name Grand Ole Opry, Gaylord's predecessors "established unique brand identity for the corporate owner of its 'barn dance' program." *Id.*

Tichi concludes that "[i]n sum, the history of the *Grand Ole Opry* and Gaylord's recent efforts to expand the Opry brand indicated that these are famous trademarks and not generic terms." *Id.* at 25:64 (emphasis in original). Tichi also testified that references to the Grand Ole Opry in its abbreviated version of "Opry" or "the Opry" abound, in popular culture, the media, and in reference works on Country and Western music; the "terms are used interchangeably in a variety of texts, referring to the trademarked brand name currently owned by Gaylord Entertainment Company." *Id* at 14:32–39.

GEG contends that Tichi's declaration only serves to strengthen its argument that the term "opry" has always been generic as evidenced by its use in the nineteenth century and onward. (Docket Entry No. 111, defendant reply to plaintiffs

response to defendant's motion for summary judgment, at 15).

Gaylord has also produced evidence to support its contention that at present the public perceives "opry" primarily as a brand associated with "Grand Ole Opry" rather than as a generic term. Gaylord introduced the depositions of GEG employees which it asserts reveals instances of actual confusion between The Carolina Opry and Grand Ole Opry, thus contradicting GEG's argument that the term "opry" is generic.[8] Theresa Kreig, an employee in the group sales department of The Carolina Opry, stated that approximately 35–40 people in the motor coach segment had asked her about an affiliation between The Carolina Opry and Grand Ole Opry in the fourteen years she has worked for the company. (Docket Entry No. 97, Kreig Deposition, at 48:1–5, 49:21–23). Kreig has also been asked if The Carolina Opry is like the Grand Ole Opry. (*Id.* at 50:23–25, 51:1–4). Ms. Kreig responded that she had been questioned about The Carolina Opry's affiliation with other opries approximately the same amount of times as with the Grand Ole Opry, and that she had been asked probably 200 times about an association with the "Dixie Stampede" which is located next to The Carolina Opry. *See id.* at 65, 66.

James Williams, an employee of GEG who worked in the call center from 1985–1986, stated that one caller to The Carolina Opry asked if she had reached the Grand Ole Opry, and when she was told that she had not, she thanked him and hung up. (Docket Entry No. 110, Williams deposition at 43:10–24). In addition, Frances Sullivan, the supervisor at the call center at The Carolina Opry, testified that many callers when making a res-

---

**8.** Gaylord argues that "if the term 'Opry' was truly generic like the word 'restaurant,' then consumers would not confuse or associate the Carolina Opry and the Grand Ole Opry just as consumers do not confuse or associate 'McDonalds Restaurant' and 'Wendy's Restaurant.'" (Docket Entry No. 81, at 25).

ervation for The Carolina Opry referenced the Grand Ole Opry. (Docket Entry No. 109, Sullivan Deposition at 15: 7–17). Sullivan was asked on deposition, "[s]o they'll [customers will] call and say, 'I'd like to get tickets to the Grand Ole Opry' and you say 'No, you mean the Carolina Opry'." *Id.* at 15:18–20. Ms. Sullivan replied, "And they'll say, 'Yeah, that's what I mean.' It's that type of thing. It's like they know what they want, it just comes out wrong." *Id.* at 15:21–23.

Gaylord has also commissioned a survey, which was conducted by John T. Mentzer, Ph.D., presently a professor of marketing at the University of Tennessee. Respondents were interviewed in three shopping malls in three states between the geographical sites of the litigants, with 210 total interviews conducted. *Id.* The survey was designed to investigate the issue of whether the existence of the alphanumeric telephone number, 1–800–THE OPRY, would convey the impression of an association with a particular company, namely "Grand Ole Opry," or whether it referred to country music generally. (Docket Entry No. 86, Declaration of John T. Mentzer, at 1).

The survey indicated that 45.7% of the overall population associates the number with a particular company, namely the "Grand Ole Opry." *See id.* Within the population of respondents who listen to country music, the relevant market, 60% associated 1–800–THE OPRY with a particular company, specifically the Grand Ole Opry in Nashville, TN. *See id.* Mentzer concluded from this study the following:

"[T]he survey results clearly support the conclusion that the general population, and the specific target market of country music listeners, expects an 800 number, 1–800–The Opry, to be associated with particular company, specifically the

Grand Ole Opry in Nashville, TN, and any other company utilizing the 800 number, 1–800–The Opry, would be misleading to the general population and the specific target market of country music listeners. The results reject any proposition that The Opry refers to country music generally or to a variety of country music shows."

*Id.* at introduction.

Gaylord also includes several Country Music reference sources and newspaper articles that refer to the "Grand Ole Opry" as "the Opry" as evidence of the primary significance of "Opry" as a trade name. (Docket Entry No. 85, Plaintiff's appendix of record evidence, at tab 32–43). Gaylord also cites to several recent dictionary sources that either do not include a definition for the term "opry," or expressly refer to the "Grand Ole Opry" in defining "opry."

### 2. GEG's Evidence

GEG relies primarily on the *Hilton* decision, and its findings of fact, to support its contention that "Opry" is generic as a matter of law. GEG has retained Dr. Joan Houston Hall as an expert witness, who is expected to testify that the word Opry emerged as a generic dialectical variation of "opera" in the nineteenth century. (Docket Entry No. 112, at tab 4). GEG complied a list of 242 opries that are in 34 states and 6 foreign countries. (Docket Entry No. 112, supplemental appendix at tab 2). GEG has also included as proof of genericness several dictionary entries that define "Opry" as a generic term referring to opera. (Docket Entry No. 63, appendix). GEG cites the Miller Brewing Company line of cases in support its contention that as a generic term, "Opry" cannot lose its generic status by proof of secondary meaning.[9] (Docket Entry No. 61, memo-

9. These cases held that "light" and "lite" were both generic terms for beer that could

randum in support of motion for summary judgment at 14–16).

## B. Conclusions of Law

Upon a motion for summary judgment the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir.1986). Under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 276 (1986).

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir.1996). No genuine issue as to any material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir.1986); *Johnson v. City of Detroit*, 944 F.Supp. 586, 591 (E.D.Mich. 1996) (citing *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). The Court examines the facts and draws all reasonable inferences therefrom in the light most favorable to the non-moving party. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir.2000) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A "material" fact exists, for purposes of summary judgment, where "proof of that fact would have the effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citations omitted). That is, "the disputed fact must be one which might affect the substantive law controlling the issue." *Johnson*, 944 F.Supp. at 591 (citing *Henson v. NASA*, 14 F.3d 1143, 1148 (6th Cir.1994)).

The moving party bears the initial burden to show that no material issue exists.

---

not be given trademark protection even upon the showing by Miller of secondary meaning in the term "lite." *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.1977); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979); *Miller Brewing Co., v. Falstaff Brewing Corp.*, 655 F.2d 5 (1st Cir.1981). In *Falstaff Brewing Corp.*, 655 F.2d at 7, the First Circuit held that Miller Brewing Company was collaterally estopped from disputing the generic nature of the term "LITE" when applied to beer. *See id.* The court rejected the district court's view that "Miller is not collaterally estopped because of a supposedly dramatic alteration between the 1970's and the 1980's in the low calorie beer market and in public understanding of the term 'LITE.'" *Id.* at 10. The courts stated that "at best" the evidence showed that "in the last half of the decade the public perception of Miller ad the source of 'LITE' has increased and become dominant in the public mind. However, evidence to that effect is irrelevant." *Id. But see Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1043, n. 18 (D.C.Cir.1989) (stating that the court in *Falstaff* made no mention of passing off and, therefore, that *Falstaff* was not contrary to the court's holding that the plaintiff could get protection from unfair competition even if the contested term "blinded veterans" was generic).

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mounts v. Grand Trunk W.R.R.*, 198 F.3d 578, 580 (6th Cir.2000) (citing *Celotex*); *Johnson*, 944 F.Supp. at 591 (citing *Ivy St.*, 822 F.2d at 1435). Once the moving party meets its burden that no genuine issues of material fact exist, the non-moving party must present evidence to prove that a genuine issue for trial does in fact exist. *Johnson*, 944 F.Supp. at 591.

The non-moving party must present additional evidence beyond the pleadings. *See Morales v. American Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir.1995). The non-moving party must present evidence that would be sufficient "for a jury to return a verdict for that party. If the evidence is merely colorable or not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 252 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations will not suffice. *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989). In a summary judgment motion, the trial "judge's function is not…to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Accordingly, "when the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept the evidence as true." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994).

With these legal principles in mind, the Court turns to the summary judgment motions in this case.

### 1. Generic Status of the Term "Opry"

GEG asks the court to summarily rule that "Opry" is a generic term—a conclusion that it contends in compelled by application of the doctrine of collateral estoppel.

Gaylord contends that the generic status of the term "Opry" is a question of material fact sufficient to preclude summary judgement.

Terms for which trademark protection is sought fall into four general categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir.1996); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C.Cir.1989). Unlike a trademark that identifies the source of a product, a generic term is one that is "commonly used as the name or description of a kind of goods." *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir.1984). A generic term does not identify and distinguish the product of only one seller. *See* 2 *McCarthy on Trademarks*, § 12.1 (4th Ed.) (hereinafter *"McCarthy"*). Thus, the original maker of the product or the first user of the term cannot acquire an exclusive right to use the term. The policy behind denying trademark protection to generic names is that "[g]eneric names are regarded by the law as free for all of us to use. They are in the public domain." *McCarthy*, § 12.2.

The Sixth Circuit has stated that "whether a name is generic is a question of fact." *Bath & Body Works, Inc.*, 76 F.3d at 748. A trademark that has been federally registered is presumed to be not generic and the defendant must overcome the presumption. *Id.* (citing *McCarthy*, § 12.2). However, "if a trademark is not federally registered, once the defendant raises genericness as a defense, plaintiff must prove lack of genericness." *Id.* The appropriate test to determine whether a mark is generic is "whether the public perceives the term primarily as the designation of the article." *Id.* (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C.Cir.

1989)). *See also* 15 U.S.C. § 1064 (1999) (the test for determining if a mark has become generic is the "primary significance of the registered mark to the relevant public"). In making a determination of whether a mark is generic, "courts consider such evidence as dictionary definitions, competitors' use, plaintiffs' use, media usage, national testimony by people in the trade, and consumer surveys." *Nat'l Baseball Hall of Fame v. All Sports Promotion Group, Inc.*, 2001 U.S. Dist. LEXIS 1592, *12 (S.D.N.Y.2001).

█ Once a name is adjudged to be generic, a seller generally cannot take it and use it as a trademark merely by use and advertising. *See McCarthy*, § 12.11. There is, however, the very rare case where with a "massive" amount of advertising, "it does appear possible for a company to reclaim a generic term from the public domain and give it trademark significance." *Id.* § 12.30. *See also Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir.1953) (holding that the name "Singer," which the Supreme Court had held was generic in 1896, had been "recaptured" from the public domain by continuous and exclusive use and advertising). However, "there is no instance of this happening to an ordinary dictionary word which was always a generic name and never performed a trademark function in its semantic history." *McCarthy* § 12.11.

### 2. Prior Litigation Regarding the Generic Status of "Opry"

In *WSM, Inc. v. Bailey*, 297 F.Supp. 870 (M.D.Tenn.1969), Gaylord's predecessor brought suit for trademark infringement and unfair competition against an individual who produced and promoted two country and western records bearing the label "Opry Records." *Id.* at 872. The Honorable William E. Miller stated that "[i]t

appears, without contradiction, that defendant adopted the name 'Opry' for its newly-formed record company almost twenty years after plaintiff had registered its mark which featured the same word." *Id.* The defendant offered "undocumented testimony to the effect that 'Opry' had become a generic term." *Id.* Gaylord offered newspaper and magazine articles and clippings which, the court concluded, "demonstrate conclusively that the term 'Opry,' standing along as defendant has used it, is constantly used in country and western music circles in referring to plaintiff's 'Grand Ole Opry.' " *Id.* at 873. This Court concluded that "the defendant has appropriated, at its peril, the dominant or salient term in plaintiff's mark, a term which identified the 'Grand Ole Opry' in the mind of the public many years before the inception of 'Opry records'—the name adopted by the defendant as a trade name." *Id.* The Court was persuaded that the "average [country and western music] purchaser is likely to be confused and likely to believe mistakingly that Opry Records has some trade connection with the 'Grand Ole Opry.' " In its holding, the court noted that the defendant did not use "any limiting or modifying words with 'Opry' which would tend to eliminate any doubt as to its connection with the 'Opry.' " Therefore, the Court concluded that defendant had infringed Gaylord's "Grand Ole Opry" service mark and issued a preliminary injunction against the defendant's use of the term "Opry." *Id.*

In *WSM, Inc. v. Hilton* 724 F.2d 1320 (8th Cir.1984), the Eighth Circuit affirmed the district court decision in *WSM, Inc. v. Hilton*, 545 F.Supp. 1212 (W.D.Mo.1982), holding that the term "opry" was generic for country music performances and cancelled Gaylord's trademark registration for the "Opry" trademark.[10] Gaylord's prede-

---

10. The district court's findings of fact included the following:

10. The word "opera" has been in common use from the eighteenth century to the

cessors brought suit alleging trademark infringement and unfair competition under the Lanham Act, and unfair competition and dilution under Missouri common law, all arising out of defendant's use of the term "Dennis Hilton's Country Shindig Opry Show." *Id.* at 1323. In affirming the district court decision that "Opry" was generic, the Eighth Circuit stated: "The evidence establishes that 'Opry' was in common use before WSM began using it in 1927 . . . . From the evidence presented, it is clear that WSM did not arbitrarily create the word 'Opry.' Instead it appears WSM chose to call their barndance radio show the Grand Ole Opry to fit the type of entertainment offered." *Id.* at 1326, 1327.

present in connection with classical grand opera and with satirical references to grand opera. Several of the satirical references to grand opera include "horse opera," "medicine opera," "jig opera," and "burnt-cork opera." A "horse opera" describes a particular genre of cowboy-western movie in which western folk songs are sung by the cowboys. A "medicine opera" describes an entertainment program which often consists of the showing of a short motion picture, of the live performance of folk or country songs and dances, of comical displays by white persons disguised as Negroes, and of the sale of medicinal and other goods. A "jig opera" or "burnt-cork opera" describes a minstrel show performed by black persons or white persons with blackened faces. These types of "operas" were often performed in the town "opera house."

11. Certain persons who reside along the mid-Atlantic seaboard, in Appalachia and in the Ozarks have adhered to a rule of pronunciation under which words ending with the letter "a" are pronounced as if the word ended with the letter "y." The word "opera" is among at least 175 words to which this rule of dialectic pronunciation applies. For example, "opera" is pronounced as "opery" or "opry." The horse, medicine and jig operas were often respectively referred to as "horse opry" or "hoss opry," "medicine opry" or "med-opry," and "jig opry."

12. . . . . The adoption of the "Grand Ole Opry" mark by WSM had its origin in the satirical contrast on a program of grand opera which immediately preceded the WSM Barndance Radio Program. Judge George D. Hay, the WSM radio announcer for the Barndance, established the satirical reference when he commented on the program that "for the past hour we have been listening to music taken largely from grand opera, but from now on we will present, 'The Grand Ole Opry.'" Judge Hay, as a newspaper reporter who lived in close contact with the rural and mountain people of Tennessee, was aware of their common vernacular, was familiar with the dialectic variation of "opera" as "opry" and knew that the satirical comparison with grand opera would be enhanced by the use of the word "opry."

13. The word "opry" is listed and defined in Webster's New Third International Dictionary as a dialectic variation of the word "opera" and as a substandard word which is today used by certain portions of the speaking American public. The use of the word "opry" is more likely to occur in oral speech rather than in printed matter. The American Thesaurus of Slang lists "opry" as a "musical performance," describes an "opery house" as a "theatre," and includes "horse opera" and "hoss opry" among terms referred to a "circus."

14. The word "opry" has been and is now used in connection with country music performances of various types. Cowboy performers in the "horse oprys" sang western songs. Minstrels in the "medicine," "jig" and "burnt-cork" oprys sang country and folk songs, and danced to similar music. Today, the word "opry" describes a show consisting of country music, dancing and comedy routines. It does not always connote "Grand Ole Opry" when it is used in oral or written discourse. When "opry" is used in connection with a description of the country music entertainment services provided by the Grand Ole Opry, it connotes the Grand Ole Opry. Similarly, when it is used in connection with the country music entertainment services provided by other organizations, like Dennis Hilton's Country Shindig Opry Show, Lee Mace's Ozark Opry, the Grapevine Opry, the Union Mill Opry, the Country Hayride Opry, and the Kansas City Opry, it connotes those organizations.

The Eighth Circuit also stated that "no matter how much money and effort WSM has poured into promoting its product and what success it has achieved in securing public identification, WSM cannot deprive others of the right to call a product or service by its generic title." *Id.* at 1327. The court concluded that "there was temporally relevant evidence in the record [11] from which the district court found find that 'Opry' as currently used by the consuming public was generic." *Id.* The Eighth Circuit also affirmed the district court holding that there was no likelihood of confusion by the public and denied the plaintiff's claims for relief. *Id.*

In earlier litigation, Gaylord filed with Trademark Trial and Appeal Board ("Board") a Notice of Opposition to GEG's application to register "Calvin Gilmore Presents The Carolina Opry" ( & design) and a Petition to Cancel GEG's registration for "The Carolina Opry" ( & design), which the board consolidated into one proceeding. The results of that litigation is discussed *infra. See Opryland USA Inc. v. The Great American Music Show, Inc.,* 970 F.2d 847, 849 (Fed.Cir.1992). The Board granted GEG's motion for summary judgment. *See id.* at 850. The Board premised its decision on the notion that the word "Opry" is generic for country music shows, and that, as such, it should not be given any consideration when comparing the trademarks of the parties. *Id.* at 850. Thus, the Board considered the similarities of the parties' marks after excluding the term "Opry" and held that "because the marks are 'otherwise dissimilar,' confusion is unlikely as a matter of law." *Id.* The Board also held that Opryland was collaterally estopped from disputing the generic nature of the term "Opry"

due to the decision of *WSM, Inc. v. Hilton,* 724 F.2d 1320 (8th Cir.1984). *See id.*

The Federal Circuit, in *Opryland USA,* 970 F.2d at 849, vacated the Board's decision and remanded the case. First, it held that the Board erred by failing to consider the marks as a whole. *See id.* at 851. The court noted that "[p]ublic perception of the various marks is a material fact, for findings on this question can affect the determination of likelihood of confusion." *Id* at 851. The Federal Circuit held that the Board erred in denying Gaylord the opportunity to obtain discovery on the material facts of the public perception and actual confusion, noting that the public perception of the relation of the marks was "not peripheral to the issue, but at its core." *Id.* at 851, 852. The Federal Circuit also held that Gaylord was not collaterally estopped from litigating the generic nature of "Opry" due to potential changed circumstances since the prior decision in *Hilton. See id.* at 853.

On remand after the Federal Circuit decision, the parties consented to several extensions of time for the discovery and testimony periods, and engaged in tentative settlement discussions. However, due to lack of progress in the case, the Board issued a show cause order in 1998 directing Gaylord to explain within thirty days why no trial briefs were filed during the testimony period. Gaylord was not informed of the Order by its then-counsel until after the expiration of the thirty-day period. (Docket Entry No. 1, ¶ 51, at 18–19). Once learning of the Order, Gaylord, in September 1988, responded to the Show Cause Order and filed a motion to reopen discovery and testimony periods. (Docket Entry No. 64, attached TTAB April 25, 2000 opinion). The Board denied Gaylord's motion to reopen and dismissed the case with prejudice.[12] *See id.* at 12. In so

---

11. The district court relied on dictionary definitions of the term from a dictionary and other related sources with 1961 copyright dates.

12. The Board noted that this was because "all testimony periods have expired and opposer has taken no testimony or submitted any other evidence." *Id.* at 12.

holding, the Board noted that while Gaylord "may have acted in good faith, we believe that applicant [GEG] may well have been prejudiced by the lengthy delay in this case." *Id.*

Notwithstanding *Hilton,* the Federal Circuit held in 1992 that Gaylord was not collaterally estopped from litigating the question of whether "Opry" was generic for country music entertainment. The Federal Circuit noted that it is proper to consider whether there has been a material change in circumstances prior to applying collateral estoppel. *See Opryland USA,* 970 F.2d at 853. The Federal Circuit stated:

> "Whether 'opry' has been *recaptured as a trademark* is not the subject of these proceedings ... However, Opryland is *not estopped from showing the public perception of 'opry',* as a significant component of the marks at issue. The Board erred in holding that Opryland could not present evidence of the present public perception of the term 'opry', for such evidence is of probative value in connection with the section 2 issues requiring adjudication."

*Id.* at 853 (emphasis added). The Federal Circuit stated that "the court in *WSM, Inc. v. Hilton* did not and could not decide questions that were not before it, including the matter of usage and public perception years into the future." *Id.* at 854.

In 1992, GEG's predecessors filed an action in a South Carolina state court against "The Myrtle Beach Opry" alleging violations of § 1114 and § 1125 of the Lanham Act and common law unfair competition and trademark infringement of its "The Carolina Opry" mark. (Docket Entry No. 84, Appendix to Plaintiff's response to defendant's motion for summary judgment). GEG's predecessors argued

that *Hilton* did not prevent the issuance of a preliminary injunction against defendant's use of the Myrtle Beach Opry because defendant had not met its burden of proving "Opry" was generic. GEG's predecessors argued that proof of genericness required the defendant to produce surveys or affidavits from the relevant market that established that "Opry" meant country and western show in general rather than The Carolina Opry.[13] (Docket No. 84, plaintiff's supplemental memo of law in support of motion for preliminary injunction at 4). In addition, GEG's predecessors argued, citing this Court's decision of *Bailey,* that the defendants were guilty of trademark infringement and unfair competition even if the term "opry" is generic. *See id.* at 7, 8. Ultimately, the parties in the Myrtle Beach Opry case entered a settlement agreement precluding the defendants from using the term "the Opry" standing alone. (Docket entry No. 113, defendant's response to plaintiff's statement of material facts ¶ 15, at 7).

### 3. Collateral Estoppel

 Under the collateral estoppel doctrine, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). The Sixth Circuit decisions prescribe four requirements which must be met for collateral estoppel to apply:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

---

**13.** Citing *Hilton,* GEG argued that the court had a "duty to learn the public's perception of 'The Carolina Opry' and 'The Myrtle Beach Opry' before making a finding that the term 'opry' is generic." *Id.* at p. 5.

(2) determination of the issue must have been necessary to the outcome of the prior proceeding;

(3) the prior proceeding must have resulted in a final judgment on the merits; and

(4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1239 (6th Cir.1996); *see also John Jay Hooker v. Federal Election Commission, et al.*, 92 F.Supp.2d 740, 744 (M.D.Tenn.2000). Collateral estoppel does not apply, however, if the controlling facts or legal principles of the current case have changed since the initial determination. *See Montana v. United States*, 440 U.S. at 155, 99 S.Ct. 970; *Opryland USA v. Great American Music Show*, 970 F.2d 847, 853 (Fed.Cir.1992).

■■■ GEG contends that Gaylord is collaterally estopped from litigating the generic nature or status of the term "Opry" in view of the decision in *WSM, Inc. v. Hilton* 724 F.2d 1320 (8th Cir.1984).

Applying the first factor of the collateral estoppel test to this case, the genericness of the term "opry" was raised and actually litigated in *Hilton*. The determination of genericness was necessary to the outcome of the prior proceeding, which resulted in a final judgment on the merits—the Eighth Circuit cancelled Gaylord's registration for the term "Opry." Finally, Gaylord's predecessor, who was the litigant in the prior case, had a full and fair opportunity to litigate the genericness of "Opry" in the prior proceeding. The test for collateral estoppel appears to have been met with regard to the precise issue actually litigated and decided in *Hilton*—that is the generic status of the term "Opry" in 1984, based on the temporally relevant evidence in the record.[14] This Court, while not bound to follow the holdings of the Eighth Circuit court, is required to follow its own precedent. *See Roddy v. Tennessee*, 366 F.Supp. 33, 37 (E.D.Tenn.1973) (stating that of circuit decisions, the court is only bound by Sixth Circuit decisions until and unless those decisions are reconsidered).

As previously discussed, the late Honorable William E. Miller in *Bailey* granted a permanent injunction against the defendant's use of the term "Opry" after holding that the label "Opry Records" infringed the "Grand Ole Opry" mark. By rejecting the argument that Opry was generic and "conclusively" finding that "Opry" standing alone "constantly" used in the relevant market of country and western music circles to refer to the Grand Ole Opry, this Court impliedly held, although it did not expressly state, that "Opry" was *not* a generic term. *See id.* at 873. This conclusion is further strengthened by the court's

---

**14.** GEG contends that the Eighth Circuit in *Hilton* held that the term "opry" was generic *ab initio*, or inherently generic, and thus incapable of becoming non-generic through proof of change in buyer understanding. (Docket Entry No. 61, Memorandum in support of motion for summary judgment of defendant GEG). However, the Court rejects this interpretation of *Hilton* for three main reasons. First, GEG's proffered interpretation ignores the case precedent of *Bailey*, in which this Court in 1969 rejected the defendant's argument that the term "Opry" was generic and granted an injunction against his use of the term. *See Bailey*, 297 F.Supp. 870, 873 (M.D.Tenn., 1969). Second, such an interpretation is inconsistent with the Federal Circuit decision that expressly held that Gaylord was not collaterally estopped from litigating the generic nature of "Opry" to show changed circumstance, an inquiry which would be moot if the term was inherently generic. *Opryland USA*, 970 F.2d at 853. Third, the court in *Hilton* did not refer to the term "Opry" as being "generic *ab initio*" or "inherently generic." *See generally Hilton*, 724 F.2d 1320 (8th Cir.1984).

use of the words "the 'Opry' " to refer to the Grand Ole Opry. *See Id.* at 873, n.6.

Therefore, this Court holds that Gaylord is not collaterally estopped from litigating the primary significance to the relevant public of the term "Opry" today. Further, since collateral estoppel is inapplicable if there are material changed circumstances since the date of the initial court determination, Gaylord's inquiry regarding the current status of the term "Opry" is entirely proper. *See Montana v. United States*, 440 U.S. 147, 159, 99 S.Ct. 970, 976, 59 L.E.2d 210 (1979) ("It is, of course, true that changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues."); *Opryland USA*, 970 F.2d at 853.

### 4. Present Public Perception of "Opry"

█ In analyzing GEG's motion for summary judgment, the Court must view the facts and all inferences to be drawn from the facts in the light most favorable to Gaylord, the nonmoving party. Summary judgment is inappropriate if the evidence in the record is such that a reasonable jury could find that "Opry" is not generic because at the present time, the public perceives "Opry" primarily as a brand, usually associated with the "Grand Ole Opry" or Gaylord, rather than as a generic country music show. *See Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996).

#### a. Gaylord's Evidence

Gaylord has produced evidence to dispute the notion that the term "Opry" is, or has ever been, a generic term for its current meaning of a country barn dance. Gaylord has retained as an expert witness Celia Tichi, Ph.D., a Professor of English at Vanderbilt University who testified that the name "the Grand Ole Opry" was not generic, but rather a distinctive brand name coined by Gaylord's predecessors which combined the familiar terms "opry" and "grand opera" in new way to produce a "unique hybrid name." (Docket Entry No. 85, Exhibit 2, Tichi Declaration ¶ 21). Tichi testified that although the term "opry," was a dialectic variation of "opera" and had been used in the United States since the seventeenth century, it did not itself "refer to the rural country music show, whose generic term instead had been 'barn dance'." *Id.* ¶ 18. In coining the name Grand Ole Opry, Gaylord's predecessors "established unique brand identity for the corporate owner of its 'barn dance' program." *Id.* ¶ 19.

Tichi concludes that "[i]n sum, the history of the *Grand Ole Opry* and Gaylord's recent efforts to expand the Opry brand indicated that these are famous trademarks and not generic terms." *Id.* at 25:64 (emphasis in original). Tichi also testified that references to the Grand Ole Opry in its abbreviated version of "Opry" or "the Opry" abound and that the "terms are used interchangeably in a variety of texts, referring to the trademarked brand name currently owned by Gaylord Entertainment Company." *Id.* at 14:32–39.

GEG contends that Tichi's declaration only serves to strengthen its argument that the term "opry" has always been generic as evidenced by its use in the nineteenth century and onward. (Docket Entry No. 111, defendant reply to plaintiffs response to defendant's motion for summary judgment, at p. 15).

Gaylord has also produced evidence to support its contention that at present the public perceives "opry" primarily as a brand associated with "Grand Ole Opry" rather than as a generic term. Gaylord introduced the depositions of GEG employees which it asserts reveals instances of actual confusion between The Carolina

Opry and Grand Ole Opry, thus contradicting GEG's argument that the term "opry" is generic.[15] Theresa Kreig, an employee in the group sales department of The Carolina Opry, stated that approximately 35–40 people in the motor coach segment had asked her about an affiliation between The Carolina Opry and Grand Ole Opry in the fourteen years she has worked for the company. (Docket Entry No. 97, Kreig Deposition, at 48:1–5, 49:21–23). Kreig has also been asked if The Carolina Opry is like the Grand Ole Opry. (*Id.* at 50:23–25, 51:1–4). Ms. Kreig responded that she had been questioned about The Carolina Opry's affiliation with other opries approximately the same amount of times as with the Grand Ole Opry. *See id.* at 65, 66.

James Williams, an employee of GEG who worked in the call center from 1985–1986, stated that one caller to The Carolina Opry asked if she had reached the Grand Ole Opry, and when she was told that she had not, she thanked him and hung up. (Docket Entry No. 110, Williams deposition at 43:10–24). In addition, Frances Sullivan, the supervisor at the call center at The Carolina Opry, testified that many callers when making a reservation for The Carolina Opry referenced the Grand Ole Opry. (Docket Entry No. 109, Sullivan Deposition at 15: 7–17).

Gaylord has also commissioned a survey, which was conducted by John T. Mentzer, Ph.D., presently a professor of marketing at the University of Tennessee. Respondents were interviewed in three shopping malls in three states between the geographical sites of the litigants, with 210 total interviews conducted. *Id.* The survey was designed to investigate the issue of whether the existence of the alphanumeric telephone number, 1–800–THE

OPRY, would convey the impression of an association with a particular company, namely "Grand Ole Opry," or whether it referred to country music generally. (Docket Entry No. 86, Declaration of John T. Mentzer, at 1). The survey indicated that 45.7% of the overall population associates the number with a particular company, namely the "Grand Ole Opry." *See id.* Within the population of respondents who listen to country music, the relevant market, 60% associated 1–800–THE OPRY with a particular company, specifically the Grand Ole Opry in Nashville, TN. *See id.*

Gaylord also includes several Country Music reference sources and newspaper articles that refer to the "Grand Ole Opry" as "the Opry" as evidence of the primary significance of "Opry" as a trade name. (Docket Entry No. 85, Plaintiff's appendix of record evidence, at tab 32–43). Gaylord also cites to several recent dictionary sources that either do not include a definition for the term "opry," or expressly refer to the "Grand Ole Opry" in defining "opry."

### b. GEG's Evidence

GEG relies primarily on the *Hilton* decision, and its findings of fact, to support its contention that "Opry" is generic as a matter of law. GEG has retained Dr. Joan Houston Hall as an expert witness, who is expected to testify that the word Opry emerged as a generic dialectical variation of "opera" in the nineteenth century. (Docket Entry No. 112, at tab 4). GEG complied a list of 242 opries that are in 34 states and 6 foreign countries. (Docket Entry No. 112, supplemental appendix at tab 2). GEG has also included as proof of genericness several dictionary entries that define "Opry" as a generic term referring

---

**15.** Gaylord argues that "if the term 'Opry' was truly generic like the word 'restaurant,' then consumers would not confuse or associate the Carolina Opry and the Grand Ole

Opry just as consumers do not confuse or associate 'McDonalds Restaurant' and 'Wendy's Restaurant.'" (Docket Entry No. 81, at 25).

to opera. (Docket Entry No. 63, appendix). GEG cites the Miller Brewing Company line of cases in support its contention that as a generic term, "Opry" cannot lose its generic status by proof of secondary meaning. (Docket Entry No. 61, memorandum in support of motion for summary judgment at 14–16).

GEG disputes Gaylord's allegations of actual confusion as demonstrated by the depositions of GEG's employees. GEG alleges that Gaylord has exaggerated the significance of the testimony of these employees without taking into account their explanations. (Docket Entry No. 113, at 3). GEG also challenges the significance of the Mentzer survey, stating:

"Mentzer's conclusions are not supported by the data he relied upon. He did not evaluate the principal significance of 'Opry,' but instead measured public response to 1–800–THE–OPRY, presented alone and not the fashion that it is utilized by The Carolina Opry (that is, as part of advertisement or brochure which clearly identifies the number as being associated with The Carolina Opry) ... [Mentzer] failed to present any evidence or opinion from which any conclusion regarding change in that public perception may be derived, and [thus] is unable to overcome the legal principle that a de facto secondary association can deprive the term of its generic status."

(Docket Entry No. 113, defendant's response to plaintiff's statement of material facts as to which there exists a genuine issue to be tried ¶ 1, at 1).

As previously discussed, the test for classifying terms as generic is the primary significance of the term to the relevant public. In an effort to satisfy this standard, Gaylord has produced a significant amount of evidence that tends to establish the primary meaning of "Opry" to the relevant public (of individuals interested in country and western music) is as a trade

name associated with the Grand Ole Opry and Gaylord. GEG has offered its own countervailing evidence. This proof serves to demonstrate that there is a genuine issue of material fact as to whether the public perceives the term "Opry" primarily as a generic term for country music or as a trade name associated with a particular company. *See SportsChannel Assoc. v. Comm'r of Patents and Trademarks*, 903 F.Supp. 418, (E.D.N.Y.1995) (denying summary judgment on the generic nature of "SportsChannel"). Accordingly, the Court denies GEG's motion for summary judgment as to the generic nature of the term "Opry."

## 5. Gaylord's Federal Lanham Act Claims

The Sixth Circuit described the purposes of the federal trademark laws as follows:

Although trademark protection may have had its start in common law as an action in fraud, over the past one hundred fifty years it has come to focus also on protecting property interests in trademarks themselves. This shift is the result of the recognition of the purposes trademarks serve in the modern, impersonal economy. *They act as a means of identifying a product as coming from or being associated with a particular, although anonymous, source, and inducing subsequent purchases by consumers.* As a commentator pointed out sixty years ago:

The fact that through his trademark the manufacturer or importer may "reach over the shoulder of the retailer" and across the latter's counter straight to the consumer cannot be over-emphasized, for therein lies the key to any effective scheme of trademark protection.... [A trademark is] not merely the symbol of good will but

often the most effective agent for the creation of good will, imprinting upon the public mind an anonymous and impersonal guaranty of satisfaction, creating a desire for further satisfactions. The mark actually *sells* the goods.

Schecter, *The Rational Basis of Trademark Protection,* 40 Harv. L.Rev. 812, 818–819 (1927) (emphasis original).

> *Thus, trademark law now pursues two related goals—the prevention of deception and consumer confusion, and, more fundamentally, the protection of property interests in trademarks.*

*Ameritech, Inc. v. American Inf. Technologies Corp.,* 811 F.2d 960, 964 (6th Cir. 1987) (emphasis added).

### a. Federal Trademark Infringement Claim

Gaylord's federal trademark infringement claim is for violations of Section 32 of the Lanham Act [16] that provides, in pertinent part, as follows:

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or *colorable imitation* of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake,* or to deceive;
>
> \* \* \* \* \* \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114 (emphasis added).[17]

▮▮▮▮ The late Judge Miller in *Bailey* held that the defendant's use of the name "Opry Records" infringed on the mark "Grand Ole Opry" because there was a likelihood that the average country and western music purchaser would be confused about a trade connection or association between the two entities. In so holding, the Court noted that "[i]t is possible to infringe a service mark by adopting only salient or dominant part of a mark, if to do so is likely to cause confusion." 297 F.Supp. at 872. The Court placed the burden on the latecomer to "to avoid confusion, mistake or deception, and [stated that] if doubt exists, it must be resolved against [the latecomer]." *Id.* at 873, n. 6. Similarly, the Sixth Circuit has stated:

> The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors:
>
> 1. strength of the senior mark;
> 2. relatedness of the goods or services;
> 3. similarity of the marks;
> 4. evidence of actual confusion;

---

16. Gaylord's claim on trademark infringement under Tennessee common law is governed by the "likelihood of confusion" standard. Thus, the Court's analysis under the Lanham Act will also apply to Gaylord's common law claim.

17. Gaylord alleges that GEG's use of the Carolina Opry mark in interstate commerce violates this provision of the Lanham Act because it creates a likelihood of confusion by

creating a false and misleading impression that the Carolina Opry is somehow affiliated with Gaylord's Grand Ole Opry, or that Gaylord endorses, sponsors or approves of GEG's the Carolina Opry. (Docket Entry No. 1, at ¶ 53–55). Gaylord also alleges that GEG's unauthorized use of the Opry marks in connection with the sale, advertising and promotion of the Carolina Opry violates the Act. *See id.* at ¶ 56.

5. marketing channels used;

6. likely degree of purchaser care;

7. the intent of defendant in selecting the mark; and

8. likelihood of expansion of the product lines.

When applying these factors to a given case, a court must remember that these factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

*Kellogg Company v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir., 2000), (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997)) (internal quotation marks, citations, and alterations omitted).

### 1. Strength of Gaylord's Mark

■ The strength of a mark depends on its distinctiveness, which is a factual determination. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280. "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Id.* (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985)). "A mark is strong and distinctive when 'the public readily accepts it as the hallmark of a particular source;' such acceptance can occur when the mark is unique, when it has received intensive

advertisement, or both." *Id.* (quoting 3A RUDOLPH CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES P20.43 (4th ed.1983)). The Sixth Circuit has looked to several different variables in assessing the strength of a mark, including the incontestibility of the mark, its arbitrariness, the existence of similar-third party registrations, and consumer recognition of the mark. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280–282.

■ A trademark becomes incontestible when it is not successfully challenged within five years of its registration. *See* 15 U.S.C. § 1065. For the purposes of assessing trademark strength, "incontestible status serves to confer upon a mark the strength accorded to a descriptive mark with secondary meaning. Accordingly, incontestible status benefits those marks which otherwise would lack inherent strength, ie., generic marks or descriptive marks without secondary meaning." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 282.

Gaylord has a valid registration for the mark "Grand Ole Opry" and for at least 39 other marks that incorporate the formative "Opry." [18] (Docket Entry No. 1, Complaint ¶ 36, at 14–15). The vast majority of these marks were registered more than five years ago, and thus "must be considered strong and worthy of full protection." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir.1988).[19] Gaylord no longer has a federal registration for the term "Opry." *See WSM, Inc. v. Hilton*, 724 F.2d 1320 (8th Cir.1984). GEG also has registered two marks that incorporate the formative "Opry," including "The Carolina Opry" (& design) and "Calvin Gilmore Presents The Carolina Opry" (& design).

---

**18.** Gaylord also holds State of Tennessee registrations for the marks "Opry," "Opryland USA" and the "Grand Ole Opry." (Docket Entry No. 1, at ¶ 37).

**19.** Gaylord registered "1–800–SEE–OPRY" and "1–800–WSM–OPRY" in 1996; neither mark is in contest.

As discussed, Gaylord challenged these marks within the first five years of their registration but the petition was dismissed with prejudice after being remanded from the Federal Circuit. *See supra* text accompanying note 12.

According to the Mentzer survey, as many as 60% of country and western music listeners surveyed identified the "1–800–THE OPRY" phone line with the Grand Ole Opry or Gaylord. Nearly 50% of those polled generally associated it with a particular company, namely the Grand Ole Opry in Nashville, Tennessee. In addition, country and western music reference sources identify the "Grand Ole Opry" as the "Opry" and several recent dictionaries explicitly refer to the Grand Ole Opry in defining the term "opry."

### 2. Relatedness of the Goods or Services

■ There are three basic categories of relatedness between products and services: "(1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991). Services are related "if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 1109. The court must ask: are the goods and services so "related so that they are likely to be connected in the mind of a prospective purchaser?" *Id.* (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963)).

The Grand Ole Opry and the Carolina Opry are both musical revue shows that feature country and western music. The Carolina Opry is located in Myrtle Beach, South Carolina, while the Grand Ole Opry is located in Nashville, Tennessee. GEG advertises the Carolina Opry in Tennessee and does business in Tennessee. The Grand Ole Opry is nationally televised. Because both parties provide similar services and compete for business in at least one common market, for purposes of this ruling, the evidence reflects that the parties are in direct competition.

### 3. Similarity of the Marks and Degree of Purchaser Care

■ To analyze properly the similarity of marks, a court must examine the "pronunciation, appearance and verbal translation of competing marks." *Wynn Oil Co.*, 839 F.2d 1183, 1187 (6th Cir.1988). Courts should examine the marks in their entirety, focusing on their "overall impression, not individual features." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283. A court must determine whether a given mark would confuse the public when viewed alone, and not in a side-by-side comparison. *See id.; Wynn Oil Co. v. Thomas*, 839 F.2d at 1187. The degree of purchaser care factor is closely related to the similarity of marks analysis.

In *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 283 (6th Cir.1997), the Sixth Circuit found that the district court erred in ignoring the "Daddy's" marks when assessing the similarity between the parties' marks. The Sixth Circuit stated: "the phrase 'Daddy's' is not merely a *component* of the 'daddy's' marks: it *is* the marks. The failure to fully consider 'Daddy's' alone was especially detrimental to the extent that defendant presents itself as 'Big Daddy's Music,' 'Big Daddy's' and 'Big Daddy,' all of which are more similar to 'Daddy's' than is the full name of the

Defendant." *Id.* (emphasis in original) (citing *McCarthy*, at § 23.15[8]) ("The common propensity to abbreviate names can contribute to a finding of likely confusion when parties drop qualifying words, leaving only the confusingly similar root terms"). The Sixth Circuit also said that the degree of similarity between these marks remains an issue of fact. *See id.* at 284.

In assessing the similarity between Gaylord and GEG's marks, the Court must examine the parties' marks in their entirety.[20] As the Federal Circuit held in *Opryland USA*, 970 F.2d at 851, the proper analysis is whether the use of the mark "Carolina Opry" is likely to cause confusion as to source with the marks of the "Grand Ole Opry" or "Ozark Opry" or "Opryland USA." *See also Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 750 (6th Cir. 1996) (stating that the district court properly instructed the jury to consider the trade dresses in their entirety according to the applicable law of *Opryland USA*). The Court must also consider the similarity between Gaylord's Opry marks and the terms used by GEG in the advertisement and promotion of The Carolina Opry, such as "the Opry," "1–800–THE OPRY" and the domain names "THEOPRY.COM" and "OPRY.NET."

GEG contends that it distinguishes its marks from Gaylord's marks by accompanying each use of its marks with the name and address of The Carolina Opry in Myrtle Beach, South Carolina. (Docket Entry No. 113, response to plaintiff's statement of material facts ¶ 11). This factor weighs in GEG's favor with respect to its use of its registered marks, but not necessarily as with regard to its use of "the Opry" and "1–800–THE OPRY" in advertising and promoting The Carolina Opry.

#### 4. Actual Confusion

■ "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. Yet, it does not follow that lack of evidence of actual confusion should be a significant factor" because actual confusion is merely one factor to be considered by the court. *Wynn Oil Co.*, 839 F.2d at 1188. However, under the Lanham Act, a plaintiff must only show a sufficient potential for confusion, and not the existence of actual confusion. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284.

As discussed, Gaylord has offered proof of actual confusion as testified to by several GEG employees. One employee testified that between 35 and 40 customers have asked about an affiliation between the Carolina Opry and the Grand Ole Opry, while another testified that customers have mistakingly referred to The Carolina Opry as the Grand Ole Opry. One employee recalled a situation in which a customer called The Carolina Opry and specifically asked if it was the Grand Ole Opry. The Court notes that there have been relatively few documented instances of confusion as compared to the number of overall ticket sales of the two entities over the fourteen-year period that The Carolina Opry and Grand Ole Opry have simultaneously been in operation.[21] *See Champions Golf Club,*

---

20. GEG argues that "[a]ny fact-oriented inquiry is unnecessary and summary judgment may be granted when, as here, the only similarity between the marks, telephone numbers and domain names is question is the common use of a generic term." (Docket Entry No. 61, motion in support of summary judgment at 19). The Court declines this argument as in conflict with Sixth Circuit precedent and contrary to the Federal Circuit's holding in *Opryland USA.*

21. The Court notes that discovery was only permitted on the limited issue of "present public perception of 'Opry,'" after GEG represented to the Magistrate Judge that discovery was unnecessary and that its motion for summary judgment would dispose of all is-

*Inc. v. Champions Golf Club, Inc.,* 78 F.3d 1111, 1120 (6th Cir.1996) (stating that "four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion"). The Court, however, finds that this evidence is sufficient to raise a genuine issue of material fact with regard to the actual, or potential, confusion between the parties' marks as it relates to the likelihood of confusion.

### 5. Marketing Channels Used and Likelihood of Expansion of Lines

This factor considers the similarities and differences between the "predominant customers" of services of the parties' and whether their marketing approaches resemble each other. *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 285 (citing *Homeowners Group,* 931 F.2d at 1110). GEG and Gaylord share the same type of predominant customers, which are those individuals who enjoy listening to live country and western music. The Carolina Opry is perhaps broader in that it also includes a "a dash of Broadway." The Grand Ole Opry features more prominent country and western music personality. Gaylord has its principal place of business in Nashville, Tennessee, actively advertises in Tennessee and across the country. Similarly, GEG and its predecessors have actively marketed their "Carolina Opry" mark in Tennessee and extensively across the east coast of the United States. GEG has "promoted and advertised 'the Carolina Opry' in Tennessee, made sales to the program at the 'Carolina Opry' to Tennessee citizens and joined Tennessee organizations to promotes its 'Carolina Opry'

programs from 1992 to the present." (Docket Entry No. 51). Both companies use similar channels to market their goods.

In addition, Gaylord intends to continue to expand its product lines. Gaylord claims that GEG intends to continue expanding its product lines. There is no evidence to the contrary.

### 6. GEG's Intent in Selecting the Mark

■ Although presence of intent constitutes strong evidence of confusion, the absence of intent is irrelevant in determining likelihood of consumer confusion. *See Daddy's Junky Music Stores, Inc.,* 109 F.3d at 287 (citing *Wynn Oil Co.,* 839 F.2d at 1189). Intent need not be shown by direct evidence of intentional copying. *See id.* at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. Further, the extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark." *Id.* (citing *Wynn Oil Co. v. American Way Serv. Co.,* 943 F.2d 595, 603–04 (6th Cir.1991)). The Sixth Circuit summarized the import of intent as "an issue whose resolution may benefit only the cause of the senior users, not of an alleged infringer." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 287.

GEG's predecessors knew of Gaylord's Grand Ole Opry at the time they adopted the Carolina Opry in 1986. Although the federal trademark registration for "Opry" had been cancelled by *Hilton* in 1984, Gaylord held valid federal registrations for the "Grand Ole Opry," "Opryland USA," "Ozark Opry," and many other Opry marks at that time as well as State of Tennessee registrations for several marks,

---

sues. (Docket Entry No. 57, Case Management Order). Gaylord was precluded "from investigating the amount spent By GEG on advertising and the amount of GEG's sales

under the OPRY-mark." (Docket Entry No. 81, Plaintiff's brief in response to defendant's motion for summary judgment, at 23, n. 10).

including the mark "Opry." The Carolina Opry was originally advertised with the slogan "Like the Grand Old [sic] Opry with a Dash of Broadway." *See* discussion *supra,* at note 7. This evidence, while not probative of GEG's intent, creates an issue of whether GEG intentionally patterned "The Carolina Opry" and its advertisements and promotions after the Grand Ole Opry, and whether it intended to divert business from Gaylord. *See Daddy's Junky Music Stores, Inc.,* 109 F.3d at 288 (stating that slight evidence for a finding of intentional copying in the record was sufficient to create an issue of whether defendant knew of plaintiff's marks and intentionally patterned defendant's name after them for purposes of a summary judgment motion).

■ To defeat a motion for summary judgment "in a case where the likelihood of confusion is the dispositive issue, a non-moving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those of the factors which may be material in the context of the specific case." *Homeowners Group,* 931 F.2d 1100, 1107 (6th Cir.1991). In reviewing the likelihood of confusion factors, the Court finds that there are genuine factual disputes as to several of the factors, including most importantly the factors of actual confusion, similarity of the marks, and GEG's intent in selecting the mark. Accordingly, the Court denies GEG's motion for summary judgment on Gaylord's trademark infringement claim.

### b. Federal Unfair Competition Claim

Gaylord's federal unfair competition claim is for violations of Section 43(a) of the Lanham Act that provides, in pertinent part, as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ As with trademark infringement actions, likelihood of confusion is the essence of an unfair competition claim. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1123 (6th Cir.1996). Thus, a judicial determination of genericness does not preclude relief under the Lanham Act for unfair competition. As one court noted, assuming a term "to be generic opens rather than closes my inquiry. Although genericness prevents a word or phrase from attaining trademark protection, it does not prevent a court from determining whether a competitor's later user of that word or phrase is unfair." *Forschner Group, Inc. v. Arrow Trading Co.,* 904 F.Supp. 1409, 1416 (S.D.N.Y.1995), affirmed by *Forschner Group, Inc. v. Arrow Trading Co.* 124 F.3d 402 (2nd Cir.1997).

In *Kellogg Co. v. Nat'l Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), the Supreme Court found that the plaintiff did not have the exclusive right to use the

trade name "shredded wheat" because it was generic. The Court, however, held that "the plaintiff was entitled to require that the defendant use reasonable care to inform the public of the source of its product." *Id.* at 119, 59 S.Ct. 109. The Court also stated that "[s]haring in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise which the consuming public is deeply interested." *Id.* at 122, 59 S.Ct. 109. Finding that there was no evidence of passing off or deception, and that the defendant has taken "every reasonable precaution to prevent confusion," the Court found that there was no unfair competition. *Id.See also Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035 (D.C.Cir.1989) (holding that "blinded veteran" was generic but that plaintiff may be entitled to protection from passing off).

■ Relief is available under the Lanham Act for generic terms regardless of whether the terms were formerly protectable trademarks that have become generic or terms that were generic *ab initio. See id; Blinded Veterans Assn'n,* 872 F.2d at 1044, n. 20. A party, however, cannot obtain relief under the Lanham Act for a claim of unfair competition which is "predicated solely on the competing use of a generic term." *Forschner Group, Inc.,* 904 F.Supp. at 1417. Rather, a party must prove "two essential elements: (1) an association of origin by the consumer between the mark and the first user, and (2) a likelihood of consumer confusion when the mark is applied to the second user's goods." *Id.*

Thus, even if the term "Opry" were generic, the trier-of-fact could determine that GEG engaged in unfair competition in its activities related to the adoption, promotion, and solicitation sales of The Carolina Opry so long as the claim is not predicated solely on GEG's use of the term

"Opry." This Court, therefore, declines the defendant's argument that if "opry" is generic, then GEG's use of the term cannot support an action for unfair competition.

As discussed, likelihood of confusion is the central inquiry in an unfair competition claim under the Lanham Act. Because material issues of fact remain regarding the likelihood of confusion, the Court denies GEG's motion for summary judgment as to Gaylord's unfair competition claim.

### c. Federal Trademark Dilution Claim

Gaylord's federal trademark dilution claim is for violations of Section 43(c) of the Lanham Act that provides, in pertinent part, as follows:

(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c).[22]

The concern with dilution is that "it might cause a gradual diminution in the mark's distinctiveness, effectiveness and, hence, value, [Dilution] corrodes the senior user's interest in the trademark by blurring its product identification or by damaging positive associations that have attached to it." *Ameritech, Inc. v. American Inf. Technologies Corp.*, 811 F.2d 960, 965 (6th Cir.1987). The Sixth Circuit has adopted the Second Circuit's standards for determining dilution set out in *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir.1999). *See V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 469 (6th Cir.2001).

■■■■ To establish a dilution claim, the *Nabisco* test requires the following: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Kellogg*, 209 F.3d at 577 (quoting *Nabisco*, 191 F.3d at 215). This test "allows the inference of likely harm to the senior mark instead of requiring actual proof." *V Secret Catalogue, Inc.*, 259 F.3d at 469. The *Nabisco* court also developed a "nonexclusive list" of ten factors to determine if dilution has occurred. *See id.* at 276. These factors include:

"[D]istinctiveness; similarity of the marks; 'proximity of the products and the likelihood of bridging the gap;' 'interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products;' 'shared consumers and geographic limitations;' 'sophistication of the consumers;' actual confusion; 'adjectival or referential quality of the junior use;' 'harm to the junior user and delay by the senior user;' and the 'effect of [the] senior's prior laxity in protecting the mark."

*Id.* (quoting 191 F.3d at 217–22).

Several of the factors are uncontested. Gaylord's "Grand Ole Opry" mark is famous. GEG uses its mark "The Carolina Opry," and also uses the terms "the Opry," "1–800–THE OPRY" and the domain names that incorporate "Opry" in commerce for commercial gain. The Carolina Opry was adopted in 1986, 59 years after the "Grand Ole Opry" began its shows and at least 30 years after it became nationally televised through television and radio medium. The only factors that are in dispute are whether "Opry" and "Grand Ole Opry" are distinctive, and whether GEG's adoption and advertisement of its marks are diluting the distinctive quality of Gaylord's marks.

### (1) Distinctiveness of Gaylord's Marks

For purposes of evaluating a mark's distinctiveness, courts should apply the " 'anti-dissection rule,' which serves to remind courts not to focus only on the prominent features of the mark, or only on those features that are prominent for purposes of the litigation, but on the mark in

---

**22.** The Tennessee statute controlling Gaylord's state dilution claim also applies "notwithstanding the absence of competition between the parties or the absence or confusion as to the source of goods or services."

its totality." *V Secret Catalogue, Inc.,* 259 F.3d at 470 (quoting *Jet, Inc. v. Sewage Aeration Systems,* 165 F.3d 419, 423 (6th Cir.1999)). The Second Circuit explained the difference between a famous and distinctive mark as follows:

> The distinctiveness in a mark is a characteristic quite different from fame. Distinctiveness is a crucial trademark concept, which places marks on a ladder reflecting their inherent strength or weakness. The degree of distinctiveness of a mark governs in part the breadth of the protection it can command. At the low end are generic words—words that name the species or object to which the mark applies. These are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name.... Thus, no one can claim the exclusive right to use the mark "CAR" for a car.

*V Secret Catalogue,* 259 F.3d at 469 (quoting *Nabisco,* 191 F.3d at 215–16 (citations omitted)).

Gaylord argues that GEG's adoption, use, and advertising of its marks dilutes the distinctiveness of Gaylord's family of Opry marks. GEG alleges that the term "Opry" is generic. Generic terms are not distinctive and undeserving of trademark protection. Thus, GEG contends that Gaylord does not have the exclusive right to use the term "Opry" and cannot base its trademark dilution claim on the fact that GEG uses the term "Opry." Gaylord, on the other hand, contends that the mark "Opry" is distinctive and is not generic for its current meaning. Because the Court has denied GEG's motion for summary judgment on the issue of the generic nature of "Opry," the trier-of-fact will have to resolve the material issues of fact and determine whether the term "Opry" is generic, and thus, not distinctive.

Gaylord also contends that even if the term "Opry" is generic and not distinctive, its registered Opry marks *are* distinctive. As discussed, the vast majority of Gaylord's Opry marks, including the "Grand Ole Opry," have been registered for more than five years and are incontestible. As such, these marks are presumed to be strong. Incontestible status affords these marks the strength accorded to a descriptive mark with secondary meaning. With exception of the term "Opry," the exact placement of Gaylord's registered marks that incorporate the formative "Opry" on the trademark ladder (of generic, descriptive, suggestive, arbitrary) is not presently being litigated.

### (2) Is "Opry" Famous?

GEG also argues that "Opry" is not a famous mark. Gaylord disagrees. Gaylord argues that it has "extensively and continuously promoted and used the registered OPRY Marks both in the United States and throughout the world, and the mark thereby has become a famous and well-known symbol of Plaintiff's goods and services." (Docket Entry No. 1, ¶ 63, at 21).

### (3) Dilution of Gaylord's Marks

In *V Secret Catalogue, Inc.,* 259 F.3d 464 (6th Cir.2001), the Sixth Circuit examined whether the defendant's use of the name "Victor's Little Secret" diluted the plaintiff's "Victoria's Secret" mark. The Sixth Circuit asked "whether a consumer would link a store called 'Victor's Little Secret' that sold women's lingerie with the more famous Victoria's Secret. We have little doubt that the average lingerie consumer would make such an association." The Sixth Circuit concluded that "[t]his, then, is a classic instance of dilution by tarnishing (associating the Victoria's Secret name with sex toys and lewd coffee mugs) and by blurring (linking the chain with a single, unauthorized establishment)

... Given this conclusion, it follows that Victoria's Secret would prevail in a dilution analysis, even without an exhaustive consideration of all ten of the *Nabisco* factors." *Id* at 473.

 Courts have recognized two main forms of dilution: blurring and tarnishment. "Blurring involves 'the gradual whittling away or dispersion of the identity and hold upon public mind of the mark or name by its use upon noncompeting goods.'" *Westchester Media v. PRL USA Holdings,* Inc., 214 F.3d 658, 670 n. 12 (5th Cir.2000) (quoting *Elvis Presley Enters., Inc. v. Capece,* 950 F.Supp. 783, 798 (S.D.Tex.1996)). "Tarnishment results when one party uses another's mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the mark." *Id.*

Gaylord alleges that GEG's activities have resulted in, and continue to cause, the tarnishment and blurring of their marks.[23] (Docket Entry No. 1, ¶ 64, at 21–22). The inquiry in this case must be whether a consumer would link a musical and variety show called "The Carolina Opry," and referred to as "the Opry" and "1–800–THE OPRY," with Gaylord's famous marks. *See v. Secret Catalogue,* 259 F.3d at 473. Gaylord need only produce evidence that gives rise to an inference of likely harm to its marks. Gaylord, to this end, has produced several incidences of what it asserts is actual confusion by customers between The Carolina Opry and Grand Ole Opry. Gaylord was not permitted to discover the amount of GEG's sales under the Opry mark. GEG contests Gaylord's interpretation of this data and its significance. GEG argues that it is not diluting Gaylord's marks. Moreover, GEG contends that

their use of the term "Opry" is incapable of supporting a dilution claim a matter of law because of that term's alleged generic status.

Since we find that there are genuine issues of material fact as to the distinctiveness and dilution prongs of the *Nabisco* test, as well a dispute as to the famousness of "Opry," the Court denies GEG's motion for summary judgment as to Gaylord's dilution claim.

### Conclusion

Given the Court's conclusions on the federal claims for trademark infringement, trademark dilution and unfair competition under the Lanham Act, the Court deems it unnecessary to address claims under the similarly worded state law statutes and comparable state common law.

For the reasons set forth above, GEG's motion for summary judgment is **DENIED.**

An appropriate order is filed herewith.

### *MEMORANDUM*

This matter comes before the Court upon Defendant Gilmore Entertainment Group's (GEG) Motion for Reconsideration or, in the alternative, Motion to Certify for an Interlocutory Appeal. (Docket Entry No. 127).

Specifically, GEG moves the Court to reconsider its Order entered on October, 1, 2001, (Docket Entry No. 126), and grant that portion of GEG's motion for summary judgment that sought a ruling that Gaylord is precluded by collateral estoppel from contesting the generic nature of "Opry." (Docket Entry No. 127). The

---

**23.** Gaylord argues that GEG is making commercial use of marks that "dilute and are likely to dilute the distinctiveness of Plaintiff's Opry Marks by eroding the public's exclusive identification of these famous marks with Plaintiff, tarnishing and degrading the positive association and prestigious connotations of the marks, and otherwise lessening the capacity of the marks to identify and distinguish the goods and services." *Id.*

Court hereby denies the motion for reconsideration.

GEG also asks the Court, pursuant to 28 U.S.C. § 1292(b), to certify for immediate appeal its Order entered on October 1, 2001, denying GEG's motion for summary judgment. Specifically, GEG seeks certification on the following issues:

(1) Whether this Court is required to apply the principles of collateral estoppel to issues decided by federal district courts in, and courts of appeals for, circuits other than the Sixth Circuit;

(2) Whether Gaylord has produced any evidence that "opry" acquired a secondary meaning... prior to 1986 when GEG began using the term; and

(3) Whether the Court should have required Gaylord to produce evidence as to the public perception of "opry" in 1984 so as to demonstrate that the public perception is different today.

(Docket Entry No. 127).

For the reasons stated herein, the Court denies the motion for certification for interlocutory appeal on these issues.

Finally, GEG requests that the Court stay the proceedings in this case while such an appeal is pending. The Court declines this request.

### Conclusions of Law

 Certification of an interlocutory appeal under Section 1292(b) is appropriate when a District Court determines that its ruling "involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order may materially advance the litigation's ultimate termination." *West Tenn. Chapter of Assoc. Builders and Contractors, Inc. v. City of Memphis,* 138 F.Supp.2d 1015, 1018 (W.D.Tenn.2000). The grant of interlocutory appeal should be applied sparingly. *Id.* at 1018.

In *In re SMEC, Inc.,* 161 B.R. 953, 1993 U.S. Dist. LEXIS 17656 (M.D.Tenn.1993), the Court denied defendants' motion for reconsideration or in the alternative for amendment to include certification for interlocutory appeal. *Id.* at 957, 1993 U.S. Dist. LEXIS 17656 at *9. In so holding, Judge Wiseman stated:

The Order in question does involve a controlling question of law about which there exists a difference of opinion. Moreover, immediate consideration of the correctness of the court's conclusion could advance the ultimate termination of this litigation. *However, this case is not so complex or protracted that it falls within the category of exceptional cases that should be granted a special right of appeal. Certainly the defendants would rather not invest further monies in the case if they could avoid doing so, but in fact, proceeding with this case in the district court may lead to a speedier disposition than if a delay were allowed for interlocutory appeal. Moreover, allowing the case to run its normal course allows all possibly appealable issues to be consolidated in one appeal.*

*Id.* at 957, 1993 U.S. Dist. LEXIS 17656 at *8–9 (emphasis added).

Similarly, in *SCI Systems, Inc. v. Solidstate Controls, Inc.,* 748 F.Supp. 1257 (S.D.Ohio 1990), the defendant moved for certification of interlocutory appeal arguing that plaintiff's trademark claim was barred by the laches defense. *Id.* at 1264. The Court determined that the decision from which defendant was pursuing an interlocutory appeal "did not depend upon a controlling question of law as to which there is substantial grounds for difference of opinion." *Id.*

Further, the Court in *SCI Systems, Inc* concluded that there were genuine issues of material fact with regard to the laches defense, and, as such, "defendant's motion

956

for summary judgment on the ground of laches was without merit, and the Court [was] not satisfied that an immediate appeal from that fact-specific decision would materially advance the ultimate termination of this litigation." *Id.* at1265. Accordingly, the Court held that "because the order from which defendant desires to appeal was simply a denial of summary judgment under Rule 56 on account of the existence of genuine issues of material fact …, the motion to pursue an interlocutory appeal at this time is without merit." *Id.*

### A) Controlling law

A matter of law is "controlling" if its resolution could materially affect the litigation's outcome. An issue is therefore controlling if its resolution on appeal could result in a reversal of a district court's final judgment. In addition, an issue may be considered controlling if its resolution has precedential value, if it is central to liability, or if it would save the Court and the litigants substantial time and resources.

*West Tenn. Chapter of Assoc. Builders and Contractors, Inc.,* 138 F.Supp.2d at 1018–1019 (internal citations omitted).

■ Here, the issues for certification, even if reversed on appeal, would not necessarily materially affect the outcome of the litigation. Gaylord brought actions against GEG for trademark infringement, trademark dilution, and unfair competition.

This Court's decision in *WSM, Inc. v. Bailey,* 297 F.Supp. 870 (M.D.Tenn.1969), and the Federal Circuit decision of *Opryland USA, Inc. v. The Great American Music Show, Inc.* 970 F.2d 847, 849 (Fed. Cir.1992), illustrate that the term "opry" is not generic *ab initio* and, thus, could potentially be recaptured from the public domain (like the Singer mark). Further, even if Court had held that Gaylord was collaterally estopped due to *Hilton* from litigating the generic status of "Opry,"

Gaylord could still prevail on its unfair competition claim. Gaylord could also potentially prevail on its trademark infringement action if the Court found a there was a likelihood of confusion and that Gaylord had reclaimed the generic term from extensive advertising. In addition, collateral estoppel would not apply if Gaylord could show changed circumstances since 1984.

In *Opryland USA, Inc.,* 970 F.2d at 849, the Federal Circuit held that Opryland was not collaterally estopped from litigating the generic nature of "opry" due to potential changed circumstances since the prior decision in *WSM, Inc. v. Hilton,* 724 F.2d 1320 (8th Cir.1984). In so holding, the Federal Circuit expressly reversed the Board's earlier decision that Opryland was collaterally estopped from disputing the generic nature of the term "opry." The Federal Circuit acknowledged that circumstances could have changed from 1984 to 1992, such that the term "opry" was no longer generic.

### B) Substantial Ground for Difference of Opinion

■ "Substantial grounds for a difference of opinion exist when (1) the issue is difficult and of first impression; (2) a difference of opinion exists within the controlling circuit; or (3) the circuits are split on the issue." *West Tenn. Chapter of Assoc. Builders and Contractors, Inc.,* 138 F.Supp.2d at 1019 (internal quotations omitted).

#### 1. Issue is difficult and of first impression

Here, the issue of the genericness of "Opry" is not first impression. *See WSM, Inc. v. Bailey,* 297 F.Supp. 870 (M.D.Tenn. 1969); *WSM, Inc. v. Hilton,* 724 F.2d 1320 (8th Cir.1984); *Opryland USA, Inc. v. The Great American Music Show, Inc.* 970 F.2d 847, 849 (Fed.Cir.1992).

2. *Difference of opinion exists within the controlling circuit*

This Court implicitly held that "opry" was not generic in *WSM, Inc. v. Bailey,* 297 F.Supp. 870 (M.D.Tenn.1969).

3. *Circuits are split on the issue.*

This district implicitly held that "opry" was not generic as of 1969. *WSM, Inc. v. Bailey,* 297 F.Supp. 870 (M.D.Tenn.1969). The Eighth Circuit held that "opry" was generic as of 1984 based on the "temporally relevant" evidence in the record. *WSM, Inc. v. Hilton,* 724 F.2d 1320 (8th Cir. 1984). In a post *Hilton* case, the Federal Circuit held that Gaylord was not collaterally estopped from litigating the primary significance of "opry" as of 1992 due to changed circumstances.

### C) *Materially advance the litigation*

Interlocutory appeal is favored where reversal would substantially alter the course of the district court proceedings or relieve the parties of significant burdens. Interlocutory appeal is most appropriate early in the proceedings. In contrast, the role of interlocutory appeal is diminished when a case is nearing trial and large expenditures have already been made.

*West Tenn. Chapter of Assoc. Builders and Contractors, Inc.,* 138 F.Supp.2d at 1026 (internal quotations omitted).

Reversal on these issues would not affect Gaylord's unfair competition claim. Additionally, since the relevant cases have established that "opry" is not generic *ab initio,* reversal on these issues might not affect Gaylord's trademark infringement claim.

### D) *Exceptional Circumstances*

"An interlocutory appeal should only be granted in exceptional circumstances, used sparingly to avoid protracted and expensive litigation." *West Tenn. Chapter of Assoc. Builders and Contractors, Inc.,* 138

F.Supp.2d at 1026 (quoting *Cardwell v. Chesapeake & O.R. Co.,* 504 F.2d 444, 446 (6th Cir.1974)). Within the Middle District of Tennessee, "interlocutory appeal is appropriate only 'protracted and expensive litigation,' where a court's false move early on in the case could lead to an enormous burden being placed on the parties who have to follow the normal routes to appeal." *In re SMEC, Inc.,* 161 B.R. 953, 957, 1993 U.S. Dist. LEXIS 17656,* 8 (M.D.Tenn.1993) (citing *Ockerman v. May Zima & Co.,* 785 F.Supp. 695, 706 (M.D.Tenn.1992)).

Here, the litigation will most likely be both expensive and extensive. The Court has already determined that there exist genuine issues of material fact as to Gaylord's federal trademark infringement, federal trademark dilution, and unfair competition claims. (Docket Entry No. 125). Further, even if the Court were to hold that Gaylord was collaterally estopped from litigating the generic nature of "opry" due to *Hilton,* which would directly contradict the Federal Circuit decision of *Opryland USA, Inc.,* Gaylord could still prevail on its unfair competition claim and potentially even on its trademark infringement claim. As this Court has previously stated: "proceeding with this case in the district court may lead to a speedier disposition than if a delay were allowed for interlocutory appeal. Moreover, allowing the case to run its normal course allows a ll possibly appealable issues to be consolidated into one appeal." *In re SMEC, Inc.,* 161 B.R. 953, 957, 1993 U.S. Dist. LEXIS 17656 at * 8–9.

Accordingly, the Court denies GEG's Motion to Certify for an Interlocutory Appeal. (Docket Entry No. 127).

### Conclusion

For the reasons stated above, the GEG's Motion for Reconsideration or in the alter-

native for Certification for an Interlocutory Appeal is **DENIED.**